# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ABDUL MOHAMMED, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 2537 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| UBER TECHNOLOGIES, INC., | ) | |
| RASIER, LLC, TRAVIS KALANICK, | ) | |
| GARRETT CAMP, and | ) | |
| RYAN GRAVES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Abdul Mohammed ("Mohammed"), formerly a driver for Uber Technologies, Inc. ("Uber"), filed a twenty-one count pro se complaint [1] against Uber, Uber's wholly owned subsidiary Rasier, LLC ("Rasier"), as well as individuals Travis Kalanick, Garrett Camp, and Ryan Graves (collectively, "Defendants"). The various counts allege violations of various state and federal laws and the United States Constitution. Defendants have moved to compel arbitration of Mohammed's claims [14, 17] pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3–4. Additionally, Defendant Camp has moved to dismiss all claims against him [17] for lack of personal jurisdiction under Federal Rule of Civil Procedure ("Rule") 12(b)(2).

Because the applicability of the arbitration provision implicates factual questions that go to the agreement's initial formation, the Court denies the first motion [14]. Defendant Camp's motion to dismiss for lack of personal jurisdiction [17], however, is granted.

## Background

Mohammed began driving for Uber on or about August 3, 2014. Compl. Jury Demand 2:10, ECF No. 1. Uber is a company that utilizes a smartphone application, or "app," to pair individuals seeking car transportation with Uber drivers. Mem. Supp. Defs. Uber & Rasier Mot. Dismiss 2, ECF No. 16. Customers use the app to hail a ride, and drivers use the app to locate and interact with customers. *Id.*

When Mohammed began driving for Uber, he used a phone supplied by Uber, on which the app was pre-installed. *See* Pl.'s Resp. Defs.' Mot. Compel Arb. ¶ 14, ECF No. 20; Hr'g Tr. of May 12, 2016, at 5:3–13, ECF No. 22. Later, Mohammed was able to install the app on his own phone. On October 1, 2014, in an effort to download the app onto his phone, Mohammed sought help from a Driver Services Representative (DSR) at Uber's office in Chicago. Pl.'s Resp. Mot. Compel Arb. ¶ 6; Hr'g Tr. at 3:11–18.

According to Mohammed, when he arrived at the office, the DSR asked him for a username and password, explaining they were needed to log in to the Uber app. Hr'g Tr. at 3:24–25; *see* Pl.'s Resp. Mot. Compel Arb. ¶ 6. Mohammed supplied

his e-mail as a username, wrote a password on a note, and handed the note to the DSR.[1]  Hr'g Tr. at 3:24–4:1.

According to Defendants, once a potential user inputs his or her log-in credentials, the app prompts the individual on two separate occasions to review and accept an agreement known as the "Rasier Agreement," a service and licensing agreement described in greater detail below.  Mem. Supp. Defs. Uber & Rasier Mot. Dismiss at 3.  Mohammed claims that he never saw these prompts.  Rather, according to Mohammed, the DSR entered Mohammed's credentials, saw the prompts, and accepted the Rasier Agreement without showing Mohammed the prompts or the agreement.  Hr'g Tr. at 4:1–2, 4:18–25.  The DSR then returned the phone to Mohammed with the app downloaded and ready for use.  *Id.* at 5:1–3.

Mohammed proceeded to use the app as a driver for Uber for a period of approximately eight months.  Defs.' Reply 9, ECF No. 25; *see also* Compl. Emp't Discrim. 2, ECF No. 1 (alleging that Defendants' misconduct began in June 2015, or nearly eight months after Mohammed began using the app).  During this period, Defendants assert that the Rasier Agreement was available for Mohammed to review through the app at any time.  Mem. Supp. Defs. Uber & Rasier Mot. Dismiss at 3.

---

[1]      In his response, Mohammed asserts that he "never created a username and password."  Pl.'s Resp. Mot. Compel Arb. ¶ 5.  In open court, however, Mohammed explained that he provided a username and password to the DSR.  Hr'g Tr. at 3:24–4:1.  It appears that what Mohammed means by saying he did not "create" a username and password is that he did not utilize the necessary software to input them into the Uber app.  *Id.* at 3:13.  Rather, the DSR "created" the username and password in Uber's system based on the information Mohammed supplied.

The Rasier Agreement, formally titled the "Rasier Software Sublicense & Online Services Agreement," contains an "Arbitration Provision" that applies to disputes "arising out of or related to [drivers'] relationship[s]" with Uber. *Id.*, Ex. D, at 12. In pertinent part, the Arbitration Provision provides:

> This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. . . . This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates.
> . . .
>
> Such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision. All such matters shall be decided by an Arbitrator and not by a court or judge.
>
> Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to disputes arising out of or related to this Agreement and disputes arising out of or related to your relationship with [Uber], including termination of the relationship.

*Id.*

On February 24, 2016, Mohammed filed suit against Uber and Rasier, as well as Travis Kalanick, Garrett Camp, and Ryan Graves in their roles as agents, servants, and employees of Uber.[2] He alleges twenty-one different counts asserting violations of various state and federal laws and the United States Constitution.[3]

---

[2] Mohammed's suit also named the John and Jane Doe stakeholders, shareholders, and owners of Uber and Rasier. Compl. Jury Demand at 1.

[3] All of these counts appear to relate to Mohammed's employment relationship with Uber. They include, inter alia, federal constitutional and statutory claims for involuntary servitude, forced labor, peonage, and unlawful employment of aliens, as well as claims under Illinois law for breach of contract, intentional infliction of emotional distress, and unjust enrichment. *See* Compl. Jury Demand at 6–17.

On May 3, 2016, Defendants moved to dismiss Mohammed's complaint and compel arbitration under the Arbitration Provision. Additionally, Defendant Camp moved to dismiss all claims against him for lack of personal jurisdiction.

## I. Motion to Compel Arbitration

### A. Legal Standard

The Federal Arbitration Act (FAA) mandates that courts enforce valid, written arbitration agreements. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002) (citing 9 U.S.C. § 2). This mandate reflects a federal policy that favors arbitration and places arbitration agreements on equal footing with all other contracts. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).

Once a court is satisfied that an agreement to arbitrate exists, the FAA instructs the court to stay proceedings on issues subject to arbitration and provides a mechanism for parties to request that the court compel arbitration pursuant to the agreement. 9 U.S.C. §§ 3–4; *see also Tinder*, 305 F.3d at 733.

A party opposing a motion to compel arbitration bears the burden of identifying a triable issue of fact as to the existence of the purported arbitration agreement. *Tinder*, 305 F.3d at 735. The opponent's evidentiary burden is akin to that of a party opposing summary judgment under Rule 56. *Id.* "[A] party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id.* The Court must believe the

evidence of the party opposing arbitration and draw all justifiable inferences in its favor. *Id.*

**B.  Analysis**

In the present case, Defendants have moved the Court to compel arbitration of Mohammed's claims.  As a threshold matter, Defendants assert that the Rasier Agreement's Arbitration Provision delegates any questions as to its "enforceability" and "validity" to an arbitrator, thereby depriving the Court of the ability to consider these questions.  In the alternative, Defendants raise two arguments as to why the Court should enforce the Arbitration Provision.  First, Defendants claim that under Illinois's Electronic Commerce Security Act, Mohammed's provision of a username and password was sufficient to bind him to the arbitration agreement.  Second, Defendants argue that Mohammed accepted the arbitration agreement by his course of conduct, by equitable estoppel, or through agency principles.[4]  For the reasons that follow, the Court concludes that none of these arguments have merit.

<u>1.  Impact of the Delegation Clause</u>

The Arbitration Provision states, in part, that it applies to "disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision."  Mem. Supp. Defs. Uber & Rasier Mot. Dismiss, Ex. D, at 12.  Defendants rely on this language—commonly referred to as the "delegation clause"—to argue that the validity of the provision as to Mohammed

---

[4]      The parties do not dispute that, to the extent state contract law governs the issues in this case, the law of Illinois applies.

(and, consequently, the applicability of the Arbitration Provision to this dispute) should be decided by the arbitrator and not this Court.

Determining the impact of the delegation clause upon the Court's ability to resolve this threshold question requires the Court to wade into a doctrinal thicket. As the Seventh Circuit has observed, "The division of labor between courts and arbitrators is a perennial question in cases involving arbitration clauses." *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 741 (7th Cir. 2010).

First up is the Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395 (1967). In *Prima Paint*, the party opposing arbitration argued that it was fraudulently induced to enter into the contract, which contained the arbitration provision in question. *Id.* at 396–97. The Supreme Court interpreted § 4 of the FAA to provide that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally," which must go to the arbitrator. *Id.* at 403–04 (footnote omitted).

The Supreme Court provided further elaboration on what appeared to be a rather straightforward rule in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006). There, the parties challenging arbitration sought to void a contract containing an arbitration agreement on grounds of illegality. *Id.* at 442–43. Citing *Prima Paint*, the Supreme Court held that (1) the provision in the contract that

contained the arbitration agreement was severable from the remainder of the contract and (2) because the parties in that case challenged the entire contract, rather than the arbitration provision itself, the applicability of the arbitration agreement was for the arbitrator to decide. *Id.* at 444–46.

In a footnote, however, the Supreme Court added the following observation:

> The issue of [a] contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded. Our opinion today addresses only the former, and does not speak to the issue decided in the cases cited by respondents (and by the Florida Supreme Court), which hold that it is for courts to decide whether the alleged obligor ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent.

*Id.* at 444 n.1 (internal citations omitted). Thus, the Supreme Court recognized a distinction between questions that go to a contract's "validity"—which, presumably, included challenges based upon fraudulent inducement as in *Prima Paint* or illegality as in *Buckeye*—on the one hand, and questions that go to whether the contract "was ever concluded." Examples of the latter would include disputes involving whether a contract was signed, whether the agent signing the contract had the authority to do so, and whether the signor was competent to enter into the agreement.

The Supreme Court's subsequent decision in *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), provided little additional guidance on this issue. There, the party contesting arbitration claimed that an arbitration agreement that she had signed as a condition of her employment at Rent-A-Center was unconscionable. *Id.* at 66. As in this case, Rent-A-Center pointed to the delegation

clause contained in the arbitration agreement to argue that the issue as to the applicability of the arbitration agreement should be decided by the arbitrator and not the court. *Id.* After reaffirming the distinction set forth in *Prima Paint* and *Buckeye* between challenges to the whole of a contract and challenges to the arbitration agreement itself*, id.* at 70, the Supreme Court found that, because Rent-A-Center was seeking to enforce the delegation provision specifically and plaintiff was challenging the arbitration agreement as a whole, the question of the agreement's validity should be left to the arbitrator. *Id.* at 72–73. In so doing, however, the Court again recognized the distinction between questions of an arbitration agreement's validity and "whether any agreement between the parties 'was ever concluded,'" noting "we address only the former." *Id.* at 70 & n.2 (quoting *Buckeye*, 546 U.S. at 444 n.1).

Then came *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287 (2010), the most recent Supreme Court decision on the subject. *Granite Rock* involved a collective bargaining agreement that contained an arbitration clause. *Id.* at 292. The parties disputed the date of the collective bargaining agreement's ratification and whether a court or arbitrator should decide the correct date (and, thus, the applicability of the arbitration provision contained therein). *Id.* The Court construed the issue as going to the collective bargaining agreement's "formation," and stated that it is "well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Id.* at 296–97 (citing *Buckeye*, 546 U.S. at 444 n.1). The Court further explained,

> [O]ur precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue. Where a party contests either or both matters, the court must resolve the disagreement (internal quotation marks and citations omitted).

*Id.* at 299–300. Thus, the Supreme Court preserved the distinction offered in *Buckeye* and *Rent-A-Center* between disputes involving the initial formation of an arbitration agreement versus disputes concerning the agreement's enforceability or applicability (at least where the arbitration agreement contains a delegation clause).

The Seventh Circuit weighed in shortly thereafter. In *Janiga*, 615 F.3d 735, the Seventh Circuit answered "the question whether the court or an arbitrator is responsible for deciding whether a particular document that the parties signed qualifies as a contract, and if so, whether that contract includes an arbitration clause." *Id.* at 737. In doing so, the court reviewed *Prima Paint* and *Buckeye*, concluding that "[i]n short, 'a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Id.* at 741 (citing *Buckeye*, 546 U.S. at 449). "*Buckeye* thus reaffirmed the validity of *Prima Paint* in allocating the responsibility for two types of challenges: challenges to the validity of the arbitration agreement and challenges to the contract as a whole." *Id.*

But then, the Seventh Circuit cast its eyes upon the Supreme Court's footnote in *Buckeye*, stating that in the footnote, "the Court in *Buckeye* acknowledged the possibility of a *third type of challenge.*" *Id.* (emphasis added). "As we understand

these footnotes [in *Buckeye* and *Rent-A-Center*] the Court was reserving for another day the question who is responsible for deciding whether the parties formed a contract at all." *Id.* Reviewing *Granite Rock*, the Seventh Circuit then concluded that it is the court and not the arbitrator that "must decide whether a contract exists before it decides whether to stay an action and order arbitration." *Id.* at 742.

Other courts have adopted a similar approach. *See Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 990 (11th Cir. 2012) (discerning a two-step process from the Supreme Court's precedents: "1) resolution of any formation challenge to the contract containing the arbitration clause, in keeping with *Granite Rock*; and 2) determination of whether any subsequent challenges are to the entire agreement, or to the arbitration clause specifically, in keeping with *Prima Paint*"); *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 406 n.5 (2d Cir. 2009) ("[Q]uestions about whether a contract was ever made . . . are presumptively to be decided by the court even without a specific challenge to the agreement to arbitrate."); *Gragg v. ITT Tech. Inst.*, No. CV 14-3315, 2016 WL 777883, at *4 (C.D. Ill. Feb. 29, 2016) (distinguishing among "(1) a challenge that is specific to the enforceability of the arbitration agreement within the contract; (2) a challenge to the validity of the whole contract; or (3) a claim that a contract was never formed," and holding that *Janiga* recognizes judicial responsibility for the latter).

Here, Mohammed disputes whether he ever formed an arbitration agreement with Uber in the first place. His argument that he never signed the agreement, assented to it, or authorized the DSR to assent to it on his behalf are precisely the

type of questions that go to an agreement's formation, as articulated by the Supreme Court in *Buckeye*. As every first-year law student learns, formation of a valid contract requires an offer and acceptance. *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007). "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 561 (7th Cir. 2012) (quoting Restatement (Second) of Contracts § 24 (1981)). Acceptance, in turn, requires an outward manifestation of assent to be bound by words or acts. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016).

Here, Mohammed's account of his interaction with the DSR raises issues as to whether a valid offer and acceptance ever occurred. According to Mohammed, he was never shown or told about the Rasier Agreement or its Arbitration Provision. Thus, his version of the facts raises an issue as to whether Defendants made an offer to enter an arbitration agreement. Additionally, Mohammed states that he himself never accepted the Rasier Agreement, but that the DSR was the one who accepted the Rasier Agreement on his behalf without informing him of it. Thus, Mohammed's account also raises an issue as to whether he ever accepted any offer by Defendants. These questions go to the formation of the agreement to arbitrate and must be decided by this Court.

Defendants attempt to sidestep this conclusion by suggesting that Mohammed's dispute "is not one of contract formation, but that his 'signature' was

allegedly procured inappropriately." Defs.' Reply 5 n.6. This argument, however, simply ignores Mohammed's position that he did not accept the Rasier Agreement. And, as we shall see, while a valid contract does not always require a signature, acceptance by the offeree is a necessary element of contract formation. *Cf. Chillmark Partners, LLC v. MTS, Inc.*, No. 02 C 5339, 2003 WL 1964408, at *2 (N.D. Ill. Apr. 25, 2003) ("The offeror has complete control over an offer and can prescribe that the offeree must sign the contract to accept it; but contract formation does not require a signature unless the offer explicitly governs the mode of acceptance.").[5]

## 2. Electronic Commerce Security Act

Moving on to the merits, Defendants argue that the parties formed a binding arbitration agreement because Mohammed supplied the DSR with a username and password. Their theory is that the username and password sufficed as an electronic signature under Illinois's Electronic Commerce Security Act (ECSA), 5 Ill. Comp. Stat. 175/1 *et seq.*, and thus binds Mohammed to the agreement.

The ECSA states in pertinent part that "[w]here a rule of law requires a signature, or provides for certain consequences if a document is not signed, an

---

[5] The cases cited by Defendants are distinguishable. They involve circumstances in which the party contesting arbitration either did not dispute formation of an arbitration agreement, *Mohamed v. Uber Techs., Inc.*, 836 F.3d 1102, 1107 (9th Cir. 2016); *Grasty v. Colo. Tech. Univ.*, 599 F. App'x 596, 598 (7th Cir. 2015), or disputed the agreement's legality, validity, enforceability, or conscionability, as opposed to its formation, *Lee v. Uber Techs., Inc.*, No. 15 C 11756, 2016 WL 5417215, at *4 (N.D. Ill. Sept. 21, 2016); *Kemph v. Reddam*, No. 13 CV 6785, 2015 WL 1510797, at *4 (N.D. Ill. Mar. 27, 2015); *Modern Space Design & Decoration (Shanghai) Co. v. Lynch*, No. 13 C 4329, 2014 WL 4897322, at *2–3 (N.D. Ill. Sept. 29, 2014).

electronic signature satisfies that rule of law." 5 Ill. Comp. Stat. § 175/5-120(a). As one commentator has explained, the purpose of the ECSA was to clarify that where a contract requires a signature to be valid—most frequently under the Statute of Frauds—an electronic signature satisfies that requirement. Jamie A. Splinter, *Does E-Sign Preempt the Illinois Electronic Commerce Security Act?*, 27 S. Ill. U. L.J. 129, 129–30 (2002). There is no indication that the ECSA was intended to fundamentally alter basic contract law such that the provision of an electronic signature alone binds a party to a contract he or she did not accept. *Cf. Swanson v. U-Haul Int'l, Inc.*, 2014 IL App (2d) 140227-U, ¶ 39 (differentiating between the requirements of a signature and acceptance in the context of the ECSA).

Thus, Defendants reliance upon the ECSA is deficient for two reasons. First, even assuming that Mohammed's username and password can serve as a valid electronic signature under the ECSA, the fact that Mohammed provided this information to the DSR (at the DSR's request, by the way) is not in itself sufficient to demonstrate that Mohammed had authorized the DSR to accept any and all contracts on his behalf, particularly contracts of which he had no knowledge. Indeed, according to Mohammed, he did not intend to sign onto anything by providing the information to the DSR. *Cf. Just Pants v. Wagner*, 617 N.E.2d 246, 251 (Ill. App. Ct. 1993) ("[T]he law has consistently interpreted "signed" to embody not only the act of subscribing a document, but also anything which can reasonably be understood to symbolize or manifest the signer's intent to adopt a writing as his or her own and be bound by it."). Thus, providing a username and password to the

DSR so that he could download the app did not bind Mohammed to the Arbitration Provision under the ECSA or otherwise.

<u>3. Acceptance by Course of Conduct, Equitable Estoppel, or Agency</u>

Additionally, Defendants assert that Mohammed should be deemed to have accepted the arbitration agreement by his course of conduct, by equitable estoppel, or under principles of agency. But Mohammed has raised triable issues of fact that preclude the Court from compelling arbitration at this time.

a. Course of Conduct

Defendants first claim that Mohammed, by driving with the Uber app for eight months and reaping its benefits, accepted the Rasier Agreement, which is a "condition precedent to Plaintiff's association with Uber." Defs.' Reply 8. "[A] party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it." *Landmark Props., Inc. v. Architects Int'l-Chi.*, 526 N.E.2d 603, 606 (Ill. 1988). But "[f]or a course of conduct to act as consent to a contract, it must be clear that the conduct relates to the specific contract in question." *Id.* To that end, if a party accepts benefits under a contract, this conduct does not constitute acceptance of specific, written terms unless there is evidence that the party took the benefits with knowledge of those terms. *Sgouros*, 817 F.3d at 1036 (refusing to conclude a party who accepted benefits under a contract thereby accepted an arbitration agreement where he had no notice of the agreement's terms); *F.T.C. v. Cleverlink Trading Ltd.*, 519 F. Supp. 2d 784, 796 (N.D. Ill. 2007) (holding that a party's receipt of service

15

under a contract did not indicate acceptance of specific, punitive terms under the contract because there was no evidence that the party knew of or agreed to the terms).

Here, Defendants have not presented any evidence to suggest Mohammed used the Uber app with specific knowledge of the Rasier Agreement, such that his conduct would have constituted acceptance of the Rasier Agreement and the Arbitration Provision.[6]  And if Mohammed lacked knowledge of the Rasier Agreement (as he asserts), his course of conduct cannot constitute acceptance of the agreement.  *See Sgouros*, 817 F.3d at 1036.

It is helpful to compare the facts of this case to those in a similar case, *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185 (N.D. Cal. 2015), *aff'd in part, rev'd in part and remanded*, 836 F.3d 1102 (9th Cir. 2016).[7]  There, the plaintiffs admitted to affirmatively accepting the Rasier Agreement when prompted by the Uber app.  *Id.* at 1195.  The court therefore found that their actions formed a contract to arbitrate.  *Id.*  In doing so, the court explained that the circumstances presented were akin to a "clickwrap" agreement, under which an offeree is asked to affirmatively assent to conspicuous, hyperlinked contract terms.  *Id.* at 1196–97.

---

[6]     Defendants' also contend that Mohammed is a versed user of driving technology and must have known that some sort of agreement governed his use of the Uber app. Defs.' Reply 2 n.3.  But Mohammed used the app on a phone supplied by Uber prior to October 1, 2014, and Defendants do not argue that the Rasier Agreement was in force during that time.

[7]     The named plaintiff, Abdul Kadir Mohamed, does not appear to have any relation to the Plaintiff in this case.  Additionally, the Court notes that the Ninth Circuit's partial reversal left the district court's reasoning discussed herein undisturbed.

The court noted that clickwrap agreements are generally valid because they ensure the offeree has an opportunity to review the hyperlinked terms and must affirmatively indicate acceptance of them. *Id.* at 1197.[8]

Here, of course, it was the DSR, not Mohammed, who accepted the terms of the Rasier Agreement on Mohammed's phone, unbeknownst to Mohammed. Thus, Mohammed could be said to have accepted the Rasier Agreement only if Mohammed knew or should have known of its terms.

As explained above, Mohammed disclaims any knowledge of the agreement, precluding any finding at this stage of actual knowledge. *Hussein v. Coinabul, LLC*, No. 14 C 5735, 2014 WL 7261240, at *2 (N.D. Ill. Dec. 19, 2014). Additionally, Defendants have failed to persuade the Court that, as a matter of law, Mohammed had constructive knowledge of the Rasier Agreement or its Arbitration Provision. Defendants contend that the terms of the Rasier Agreement were conspicuously available to Mohammed on the app for "review at [his] leisure" through a "Driver Portal," which "includes access to the applicable contracts entered into by any given independent transportation providers via a conspicuous download button." Mem. Supp. Defs. Uber & Rasier Mot. Dismiss, Colman Decl. ¶¶ 10, 14. Defendants have

---

[8] The court distinguished the Rasier Agreement from "browsewrap" agreements. In such agreements, a user is given access to a website or services without first needing to affirmatively assent to the agreement, which is available separately or hosted on another webpage. *Id.* at 1196–97. "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Be In, Inc. v. Google Inc.*, No. 12–CV–03373–LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013). As opposed to clickwrap agreements, the enforceability of browsewrap agreements depends upon whether "there is evidence that the user has actual or constructive notice of the site's terms." *Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *6 (N.D. Cal. June 25, 2014), *aff'd*, No. 14-16405, 2016 WL 6072192 (9th Cir. Oct. 13, 2016).

provided no indication, however, of how frequently Mohammed (or other Uber drivers) accessed or should have accessed this portal. *Cf. Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 791–92 (N.D. Ill. 2011) (observing the importance of the convenience and frequency of references to terms and conditions in determining constructive knowledge for the purposes of a browsewrap agreement). Additionally, a review of Defendants' copy of this portal reveals that the link to the agreement is situated at the bottom of the page in small font under the vague heading, "Contracts," with the unilluminating title, "Rasier Software Sublicense Agreement June 21 2014." Mem. Supp. Defs. Uber & Rasier Mot. Dismiss, Ex. F. Based on this review, the Court cannot conclude that Mohammed should have seen this link and should have known it contained an Arbitration Provision. *See, e.g., Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 936–37 (E.D. Va. 2010) (concluding that terms of use "available for review" by hyperlink at the bottom of a webpage could not constructively form a browsewrap agreement); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 236–37 (2d Cir. 2016).

Accordingly, the Court declines to compel arbitration based on Defendants' claim that Mohammed assented to the Rasier Agreement and its Arbitration Provision by his course of conduct.

### b.   Equitable Estoppel

A similar analysis explains why equitable estoppel does not compel arbitration at this stage. "Equitable estoppel may arise whenever a party, by his word or conduct, reasonably induces another to rely on his representations, and

leads another, as a result of that reliance, to change his position to his injury." *Time Warner Sports Merch. v. Chicagoland Processing Corp.*, 974 F. Supp. 1163, 1173 (N.D. Ill. 1997) (quoting *Gold v. Dubish*, 549 N.E.2d 660, 664 (Ill. App. Ct. 1989)). To establish equitable estoppel, a party need not show fraud in the sense of intentional misrepresentation or deceit; instead, the test is whether, in light of all relevant circumstances, "conscience and [the] duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct." *Id.* (quoting *Ceres Ill., Inc. v. Ill. Scrap Processing, Inc.*, 500 N.E.2d 1, 7 (Ill. 1986)). Importantly, however, "[t]he party asserting a claim of estoppel must have relied upon the acts or representations of the other and have had no knowledge or convenient means of knowing the facts, and such reliance must have been reasonable." *In re Marriage of Smith*, 806 N.E.2d 727, 730–31 (Ill. 2004).

Here, the Court finds that, based on Mohammed's representations of what occurred with the DSR, the record at this stage does not establish that Mohammed was bound to the Rasier Agreement by equitable estoppel. First, according to Mohammed, the DSR accepted the Rasier Agreement without notifying Mohammed of its existence or terms. Taking Mohammed's allegations as true, which the Court must do at this stage, the DSR must have known that Mohammed did not accept the agreement. Furthermore, assuming Mohammed's account is credible, it would not be reasonable for Defendants to believe that their own employee could accept an agreement on Mohammed's behalf without first informing him of it. Moreover, Defendants have failed to demonstrate any action on Mohammed's part that would

reasonably induce Defendants into thinking he had assented to the specific terms of the Rasier Agreement. Accordingly, a triable issue of fact exists as to this issue, and the Court declines to compel arbitration based on the theory of equitable estoppel.

c.      Agency

Lastly, Defendants argue that, when agreeing to the terms of the Rasier Agreement, the DSR was acting as Mohammed's agent, whether through implied actual authority, apparent authority, or ratification of the DSR's actions. But there are facts in the record that would belie these claims.

Implied actual authority arises when a principal, through words or actions, creates reasonable belief by an agent that the agent has authority to take a particular action. *Cove Mgmt. v. AFLAC, Inc.*, 986 N.E.2d 1206, 1212 (Ill. App. Ct. 2013). Apparent authority can arise from the same words or actions of a principal, but the relevant inquiry is whether a third party is reasonable in believing an agent has authority to act for the principal. *Id.* And even without actual or implied authority, a principal can ratify the unauthorized act of an agent by accepting benefits received through the act. *Id.* at 1214–15. The principal must, "'with full knowledge of the act, manifest an intent to abide and be bound by the transaction.'" *Id.* at 1215 (quoting *Gambino v. Boulevard Mortg. Corp.*, 922 N.E.2d 380, 413 (Ill. App. Ct. 2009)).

Accepting Mohammed's version of what transpired, none of these theories applies here. The DSR did not have implied actual authority because Mohammed's

mere provision of a username and password was not sufficient for the DSR to form a reasonable belief that he could accept any agreements on Mohammed's behalf without notifying him of such. Similarly, it was not reasonable for Defendants to believe that the DSR had authority to enter into the Rasier Agreement on Mohammed's behalf, because Mohammed took no actions that would justify such a belief. And as discussed above, the record is insufficient to establish as a matter of law that Mohammed knew or should have known of the Rasier Agreement. Finally, it would be odd indeed to hold as a matter of law that a DSR employed by Uber could become an authorized agent of a driver, merely because the driver sought out the DSR's assistance. It would seem a simple matter for Uber to train its DSRs to first obtain the consent of the driver before accepting the agreement via the app or to pass the phone to the driver so that the driver could do it himself.

For these reasons, the Court denies Defendants' motion to compel arbitration.

## II.   Motion to Dismiss for Lack of Personal Jurisdiction

### A.   Legal Standard

Defendant Camp has moved separately to dismiss the claims against him for lack of personal jurisdiction pursuant to Rule 12(b)(2). When a defendant moves to dismiss under Rule 12(b)(2), the plaintiff has the burden of demonstrating personal jurisdiction over the defendant. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). That burden, in a case where a court rules on the motion to dismiss solely based on the submission of written materials, is "to make out a *prima facie* case of personal jurisdiction." *Id.* (quoting *Hyatt Int'l Corp.*

*v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002)).  The court should resolve all factual disputes in the plaintiff's favor.  *Id.*  Importantly, however, "[w]here factual assertions amount only to vague generalizations or unsupported allegations, they are not enough to support personal jurisdiction."  *Richter v. INSTAR Enters. Int'l, Inc.*, 594 F. Supp. 2d 1000, 1016 n.6 (N.D. Ill. 2009); *see also In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 136 F. Supp. 3d 968, 972–73 (N.D. Ill. 2015).

Whether a federal court has jurisdiction over a party is determined by reference to the Due Process Clause of the Fourteenth Amendment and the relevant state long-arm statute.  *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Illinois's long-arm statute permits the exercise of jurisdiction to the full extent permitted by the U.S. Constitution.  735 Ill. Comp. Stat. 5/2-209(c).  Thus, in Illinois, the federal and state law inquiries merge.  *Tamburo*, 601 F.3d at 700.  "The key question is therefore whether [a] defendant[] ha[s] sufficient 'minimum contacts' with Illinois such that the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'"  *Id.* at 700–01 (quoting *Int'l Shoe Co. v. Washington.*, 326 U.S. 310, 316 (1945)).  In other words, a defendant "must have purposely established minimum contacts with the forum state such that he or she 'should reasonably anticipate being haled into court' there.'"  *Id.* at 701 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

There are two types of personal jurisdiction.  The first, general jurisdiction, arises when a defendant has contacts with a state so "continuous and systematic"

that the defendant is subject to jurisdiction for any action in that state, regardless of its connection to his or her contacts there. *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). Specific jurisdiction, on the other hand, requires that a defendant's contacts "directly relate to the challenged conduct or transaction." *Id.* at 702.

### B. Analysis

In this case, Defendant Camp moves to dismiss all claims against him for lack of personal jurisdiction. He states that he is a California resident and has traveled to Illinois only once in the last five years to attend Uber's launch party in Chicago. Mem. Supp. Def. Camp's Mot. Dismiss, Ex. 2 ¶¶ 2, 6. He has never lived, worked, or had an office in Illinois. *Id.* ¶¶ 2–3. While he serves as the chairman of Uber's board of directors, he asserts that he was "not involved in the decision that Uber would operate or conduct business in Illinois or have an office or employees in Illinois." *Id.* ¶¶ 4, 9. He states that he has never met Mohammed, spoken with him, or otherwise corresponded with him. *Id.* ¶ 11.

Based on the present record, the Court finds that Defendant Camp does not have continuous or systematic contacts with Illinois that would support general personal jurisdiction. Camp does not work or spend regular time in Illinois as chairman of Uber's board and has traveled to the state only once in the last five years.

Furthermore, the Court finds specific personal jurisdiction also lacking. Camp took no part in Uber's expansion into Illinois, and his one contact with

Illinois related to Uber was its launch party, which predates Mohammed's relationship with the company by several years. *See, e.g.*, *Allman v. McGann*, No. 02 C 7442, 2003 WL 1811531, at *5 (N.D. Ill. Apr. 4, 2003) (holding that a corporation's vice president who "never lived in Illinois, never owned property in Illinois, never paid taxes in Illinois, and never [was] involved in any litigation in Illinois," and who visited Illinois only once to attend a conference, could not be subject to the court's jurisdiction for wrongs allegedly committed in Illinois by his employer); *see also Lakeview Tech., Inc. v. Vision Sols., Inc.*, No. 05 C 7209, 2007 WL 79246, at *5 (N.D. Ill. Jan. 9, 2007) (describing Illinois's fiduciary shield doctrine, which protects non-resident directors of corporations from being haled into court in Illinois merely because of contacts occasioned by acts as a fiduciary of a corporation).

For his part, Mohammed states that Camp has derived personal income from Uber's activities in Illinois. Pl.'s Resp. Def.'s Mot. Dismiss Personal Juris. ¶ 1, ECF No. 23. He further alleges that Camp has "established contact with the state by telephone, email, facsimile, or email transmission" and "published advertisements throughout the State of Illinois via print media and electronic media." *Id.* ¶ 3. Finally, he claims that "Garrett Camp was the mastermind behind the launch of Uber in Chicago and he was present in Chicago at the launch of Uber in Chicago." *Id.* ¶ 6. These statements, however, are conclusory, vague allegations that are insufficient to make a prima facie showing of personal jurisdiction. *Richter*, 594 F. Supp. 2d at 1016 n.6. To make a prima facie showing of personal jurisdiction,

Mohammed must do more than make unsupported statements that controvert Camp's sworn affidavit. *Recycling Scis. Int'l, Inc. v. Four Seasons Envtl., Inc.*, No. 03 C 6460, 2004 WL 830481, at *3 (N.D. Ill. Apr. 16, 2004).

Additionally, the mere fact that Uber has conducted business and established contacts with Illinois does not automatically establish personal jurisdiction over Camp as its chairman, without showing his personal involvement. *Egan v. Huntington Copper, LLC,* No. 12 C 9034, 2014 WL 585316, at *2 (N.D. Ill. Feb. 14, 2014). (collecting "settled precedent holding that a business's contacts cannot be attributed to individual officers or directors for [the] purposes of determining whether personal jurisdiction lies over the individuals," and that the focus must instead be on the individuals' contacts). Finally, even if Mohammed's allegations are taken at face value, they do not show Camp's contacts with Illinois had a direct relationship to the claims Mohammed brings in this case.

Accordingly, the Court dismisses Defendant Camp for lack of personal jurisdiction.

## Conclusion

For the reasons stated herein, Defendants motions to compel arbitration [14, 17] are denied. Defendant Camp's motion to dismiss for lack of personal jurisdiction [17] is granted. A status hearing is set for 3/7/17 at 9:00 a.m. The parties should be prepared to schedule a trial focused on issues related to the formation of the arbitration agreement. To the extent that the parties believe that

limited expedited discovery is necessary prior to such a trial, the parties should present their views at the status hearing.

**IT IS SO ORDERED.**                    ENTERED   2/14/17

_____
**John Z. Lee**
**United States District Judge**