**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ABDUL MOHAMMED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 1:16-cv-02537 |
| v. | ) | |
| | ) | Honorable John Z. Lee |
| UBER TECHNOLOGIES, INC., *et al*. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**UBER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**CONCERNING FORMATION OF THE ARBITRATION AGREEMENT**

Pursuant to Federal Rule of Civil Procedure 52, Defendants Uber Technologies, Inc., Rasier, LLC, Travis Kalanick, and Ryan Graves (collectively, "Uber") request that this Court make the following findings of fact and conclusions of law, and grant their motion to compel arbitration.

**PRELIMINARY STATEMENT**

On June 14, 2017, this Court presided over a one-day hearing concerning Uber's motion to compel arbitration, which was "focused on issues related to the formation of the arbitration agreement." Memorandum Order and Opinion, *Mohammed v. Uber Techs., Inc.*, No. 16 C 2537, 25 (N.D. Ill. Feb 14, 2017), ECF 47 (the "Feb. 14 Opinion"). In particular, the Court held the hearing to evaluate the evidence concerning the parties' competing, inconsistent accounts of the process by which Plaintiff Abdul Mohammed activated an Uber driver partner account that allowed him to access the Uber smartphone application (the "Uber App") to connect with riders seeking independent transportation services.

The evidence overwhelmingly weighs in favor of Uber's consistent and credible testimony and documents establishing that Mr. Mohammed agreed to arbitrate his dispute with Uber. *First*,

1

the hearing established that Mr. Mohammed agreed to arbitrate when he went online in the Uber App for the first time as a driver partner on October 1, 2014. Uber's sign-up process screens in the App clearly informed first-time driver partners that they were required to agree to terms and conditions (the "Terms," which contained an arbitration clause) in order to go online in the App, and required the driver partner to *twice* affirmatively confirm agreement to those terms. Mr. Mohammed contends that he never saw these sign-up screens or the Terms, implying that the Uber employee who assisted him with loading the Uber App onto his cell phone clicked past them without telling Mr. Mohammed before handing the phone back. However, two Uber employees who provided sign-up support at the time of Mr. Mohammed's account activation—including the employee who assisted Mr. Mohammed himself—testified that Uber's practice was for Uber employees *never* to consent to the Terms on behalf of any driver partner. They also testified that they always followed this important Company practice.

Mr. Mohammed's version of events does not withstand scrutiny. The only evidence Mr. Mohammed presented at the hearing was his own testimony, in which he claimed to "remember vividly" signing up with Uber over two-and-a-half years ago (at the exact same time he was signing up for accounts with at least two of Uber's competitors). But Mr. Mohammed's account is inconsistent with Uber's practices regarding acceptance of the Terms, as well as the fact that it did not accept cash cell phone deposits (which Mr. Mohammed claims to have paid). Mr. Mohammed's story also is inconsistent with Uber's computer records regarding his driver partner account. Moreover, Mr. Mohammed simply is not a credible witness. Among multiple exaggerations, spurious claims, and misrepresentations laid bare on cross examination, Mr. Mohammed admitted he made misrepresentations to both Uber and a competitor in the hopes of earning bonuses to which he was not entitled.

*Second*, the hearing also established that even if Mr. Mohammed did not accept the Terms when he completed the sign-up process, he accepted them on each of the over 2,000 times he accessed the Uber App for leads to connect with riders. The Terms were consistently and conspicuously available in Mr. Mohammed's online driver portal when he chose to access the Uber App. It is uncontested that Mr. Mohammed accessed the online portal and that Uber directed him to the portal for information regarding his driver partner account. It also is uncontested that—notwithstanding his current claims—Mr. Mohammed received an email from Uber Partner Support in May 2015 specifically noting that Mr. Mohammed agreed to Uber's terms of service when "signing up to drive." Indeed, Mr. Mohammed knew from his experience opening provider accounts with Uber and other technology application providers that access to such applications depended upon agreement to the technology service provider's terms and conditions

For the reasons set forth below and in Uber's accompanying Post-Hearing Brief, Uber respectfully submits that the Court should grant Uber's motion and compel Mr. Mohammed to participate in the arbitration process to which he agreed when he activated his driver partner account and when he continued to access the Uber App with knowledge of the Terms that governed that access.

## PROPOSED FINDINGS OF FACT

### I.     The Parties.

1.      Uber Technologies, Inc. is a technology company that provides access to the Uber App smartphone application, which allows riders and independent transportation providers (also called "driver partners") to connect based on their location. (Ex. 1, Rasier Agreement, at 1.)[1]

---

[1] In these Proposed Findings of Fact and Conclusions of Law, "Ex." refers to the exhibits Uber moved into admission at the June 14, 2017 hearing. Mr. Mohammed did not move any exhibits into evidence. "Tr." refers to the transcript of the June 14, 2017 hearing. In addition, when Uber refers to the testimony of a particular

2.      Rasier, LLC ("Rasier") licenses the Uber App from Uber, and Rasier in turn provides driver partners with access, for a fee, to the lead generation services provided by the Uber App.  This access is provided pursuant to the Terms—a sublicense and online services agreement between Rasier and each driver partner, which also is referred to as the "Rasier Agreement."  (Ex. 1 at 1.)

3.      Plaintiff Abdul Mohammed completed the sign-up process to open an Uber driver partner account on October 1, 2014.  On that day, Uber activated Mr. Mohammed's driver partner account, and Mr. Mohammed's account accessed the Uber App for the first time.  (Munion Tr. at 51:5-13; Ex. 7, Uber Record of Mohammed Driver Partner Account Activation; Ex. 8, Uber Record of Mohammed Driver Partner Account Sign-Up Activity; Uber  Ex. 40, Lifetime Completed Trip Information for Abdul Mohammed, at UBNDIL000059 (showing Mr. Mohammed's first trip as a driver partner on October 1, 2014).)

4.      Mr. Mohammed used his driver partner account to access the Uber App from October 1, 2014, to June 15, 2015, and during that time he used the lead generation services provided by the Uber App to connect with riders over two thousand times to provide independent transportation services in exchange for the fare paid by the rider (minus certain fees). (Mohammed Tr. at 90:15-19; Ex. 40 at UBNDIL000059, 000118.)

**II.     Uber's Driver Partner Sign-Up Process As of October 1, 2014.**

5.      Uber presented the testimony of two witnesses concerning the driver partner sign-up process, both of whom had personal knowledge of that process as it existed on and around October 1, 2014, when Mr. Mohammed's driver partner account was activated.  Those witnesses were:

---

witness from the hearing, that witness's last name also is indicated.  For example, "Moloney Tr." refers to Mr. Moloney's testimony.

      a.     **Brian Moloney**, a Senior Operations Manager at Uber in Chicago.  Mr. Moloney started working at Uber in June 2014, and in October 2014 he was an Operations and Logistics Manager.  His responsibilities in that role included providing in-person assistance to new driver partners working to complete the driver partner sign-up process.  Mr. Moloney has personal knowledge of that sign-up process and of the practices Uber had in place and communicated to its employees regarding that process.  (Moloney Tr. at 10:14-11:18, 44:11-16.)

      b.     **Shea Munion**, who worked for Uber in Chicago from late 2012 to March 2015.  (Munion Tr. at 49:5-6.)   In October 2014, Mr. Munion worked as an Operations Coordinator, providing support to driver partners with the sign-up process and other tasks.  (*Id.* at 49:9-16.)  In this role, Mr. Munion became familiar with the driver partner sign-up process.  (*Id.* at 49:17-20.)

   6.     In October 2014, the sign-up process for new driver partners generally began when the driver partner created a user name and password for the new account, consented to a background check, and provided personal identification and vehicle information.  (Moloney Tr. at 11:22-14:4.)

   7.     Once a driver partner who had completed these steps had passed the required background check, an Uber employee would "activate" the new driver partner account—meaning that the user name and password could then be used to sign on to the driver partner Uber App.  When a driver partner accessed the Uber App for the first time following activation, there were certain additional steps necessary to complete the sign-up process.  To go online and use the Uber App to connect with riders, the driver partner had to agree affirmatively—twice—to Uber's driver partner Terms, including the June 21, 2014, Rasier Agreement.  In addition, the driver partner

needed to enter financial information into the driver partner Uber App (to receive future payments for independent transportation services provided to riders).  (*Id.* at 11:22-14:4.)

8.       With respect to the requirement that the driver partner consent to the Terms, notice of the Terms and documentation of the driver partner's consent was provided through two screens in the driver partner Uber App.  The first time a driver partner with an activated account attempted to go online through the Uber App, the following screen (or one substantively identical to it) would appear on the driver partner's mobile device:



(Ex. 2, Uber Driver Partner Sign-Up Screen No. 1; Moloney Tr. at 14:12-21.)

9.       This screen notified the driver partner that: "TO GO ONLINE, YOU MUST REVIEW ALL THE DOCUMENTS BELOW AND AGREE TO THE CONTRACTS BELOW." The titles of three documents listed directly below this notification were hyperlinks that "clicked through" to each referenced agreement.  The hyperlink for "Software License Agreement June 21,

2014" clicked through to the text of the Terms, also known as the June 21, 2014, Rasier Agreement. (Ex. 2; Moloney Tr. at 15:21-17:7.)

10.     The Terms contained an arbitration clause and notified driver partners of that fact on the first page of the Terms in a section labeled as "**IMPORTANT**" and emphasized in bold and capitalized letters.  (Moloney Tr. at 17:8-19; Ex. 1 at 1, 11-16.)

11.     As part of the driver partner sign-up process, each driver partner had the discretion to choose whether to click through the hyperlinks to review each referenced contract, including the Terms.  (Moloney Tr. at 15:21-17:7; Munion Tr. at 56:3-6.)

12.      As seen above, a final line of text appeared below the hyperlinks to the contracts. That text read: "By clicking below, you represent that you have reviewed all the documents above and that you agree to all the contracts above."  Finally, a large, green button was below this statement labeled with the words, "Yes, I agree."  (Ex. 2; Moloney Tr. at 13:11-21, 14:9-15:13.)

13.     The new driver partner had to click the green "Yes, I agree" button before the Uber App would allow him to advance in the sign-up process.  (Moloney Tr. at 13:11-14:4, 15:11-13.)

14.     If the new driver partner clicked the green "Yes, I agree" button, a second screen concerning the Terms would then appear on the driver partner's mobile device.  This second screen appeared as follows (or a screen substantively identical to this screen):



This screen showed a single pop-up window containing the words: "Please confirm that you have reviewed all the documents and agree to all the new contracts." Two buttons appeared below this message; one read simply: "No." The other button read "Yes, I agree." The new driver partner could not advance past this screen and complete the sign-up and go online with the Uber App to connect with riders without clicking this second "Yes, I agree" button. (Ex. 3, Uber Driver Partner Sign-Up Screen No. 2; Moloney Tr. at 13:11-14:4, 15:11-13.)

15. From time to time, driver partners wanted or needed assistance with the sign-up process. In October 2014, driver partners in Chicago who sought in-person assistance with the sign-up process could receive it at Uber's Partner Service Center ("PSC"), which was located at 300 N. Elizabeth Street. (Moloney Tr. at 11:3-14; Mohammed Tr. at 65:7-8.) Both Mr. Moloney and Mr. Munion provided driver partners with in-person assistance with the sign-up process at the PSC in and around October 2014. (Moloney Tr. at 10:18-24; Munion Tr. at 49:5-16.)

16.     When Uber representatives at the PSC met with driver partners, they sometimes helped the partners enter their account information into the mobile device, such as name, address, user name, and password.  (Munion Tr. at 61:6-18.)

17.     There were certain steps in the driver partner sign-up process, however, that the driver partners had to complete themselves.  (Moloney Tr. at 44:9-45:21.)

18.     In particular, in October 2014, the practice at the Chicago PSC was to make sure that the driver partner himself—and not an Uber representative—had the opportunity to review the Terms and clicked the "Yes, I agree" buttons on the sign-up screens that indicated the driver partner's consent to the Terms.  (*Id.*)

19.     Uber communicated this practice to the Uber representatives assisting driver partners with the sign-up process.  Indeed, Mr. Moloney testified that he was told "multiple, multiple times" that Uber representatives should not click the "Yes, I agree" buttons in the sign-up screens for driver partners.  (*Id.*)

20.     Mr. Moloney never clicked the "Yes, I agree" buttons for a driver partner, and he never observed any other Uber representative at the Chicago PSC—including Mr. Munion—do so either.  (*Id.*)

21.     Mr. Munion's personal practice with respect to the "Yes, I agree" screens was consistent with the general Uber practice that Mr. Moloney described.  Mr. Munion's practice was to let the driver partner know that these screens concerned terms and conditions between the driver partner and Uber, "and if [the driver partner] wanted to use Uber, [he or she] need[ed] to agree to these."  (Munion Tr. at 53:20-54:4.)

22.     Mr. Munion strictly followed the Uber practice of never clicking the "Yes, I agree" buttons on driver partners' behalf: In his two years working at Uber, he never once clicked a "Yes,

I agree" button on a driver partner's behalf. If Mr. Munion were holding the driver partner's cell phone at the time the "Yes, I agree" screens came up in the sign-up process, he would always hand the phone back to the driver partner to complete those screens. (*Id.* at 49:5-6, 54:5-15.)

23.     Mr. Munion explained that he did not click the "Yes, I agree" screens for a driver partner because he understood that those screens established an agreement between the driver partner and Uber—not Mr. Munion and Uber. Consequently, Mr. Munion believed that it was "important" that the driver partner signing up agree to the Terms personally. (*Id.* at 54:5-15.)

24.     In addition to its practices concerning the sign-up screens, Uber's driver partner sign-up practices regarding leased cell phones also are relevant in this case because Mr. Mohammed claims an Uber representative first logged his account into the Uber App on a leased phone for which he paid a $100 cash deposit. (*See infra* ¶ 30.) Mr. Moloney and Mr. Munion testified regarding those leased phone practices. In October 2014, Uber driver partners had the option of either using their own iPhones to access the Uber App or leasing an iPhone from Uber for that purpose. If a driver partner chose to lease an iPhone from Uber, Uber required the driver partner to make a $200 deposit on the phone. The deposit was made as a series of electronic debits to the driver partner's account with Uber. The Uber representatives assisting driver partners with the sign-up process in October 2014, including Mr. Munion, never accepted cash for phone deposits. (Moloney Tr. at 18:2-19:4; Munion Tr. at 51:20-52:22.) As both Mr. Munion and Mr. Moloney testified, the PSC did not have any facilities for receiving cash (Moloney Tr. at 19:1-4; Munion Tr. at 52:13-22), and the office did not keep any petty cash on-hand (Munion Tr. at 61:4-5.)

III.    **Mr. Mohammed Agreed to Uber's Terms, Including the Arbitration Agreement, on October 1, 2014.**

10

25.    On October 1, 2014, Mr. Mohammed visited Uber's Chicago PSC.    Mr. Mohammed had previously created a username and password for a driver partner account and passed the required background check.    However, Mr. Mohammed wanted assistance in completing the driver partner sign-up process and activating his account so that he could go online in the Uber App and connect with riders. (Mohammed Tr. at 65:4-8, 66:14-19; Moloney Tr. at 22:9-17.)

26.    Neither Mr. Mohammed nor Mr. Munion recall meeting with each other at the PSC on October 1, 2014.  Uber's records, however, establish that Mr. Mohammed personally met with Mr. Munion on that day.  (Moloney Tr. at 21:6-19, 22:9-17, 23:3-6, 16-18; Mohammed Tr. 51:5-13, 78:11-13; Ex. 7; Ex. 8.)  Mr. Mohammed did not dispute that he met with Mr. Munion, nor did he recall any details of the Uber representative he met with on October 1, 2014, which would have suggested that he met with someone other than Mr. Munion. (Mohammed Tr. at 66:5-7, 78:11-13.)

27.    Uber's records also establish that, during the October 1, 2014, in-person meeting between Mr. Mohammed and Mr. Munion, Mr. Munion changed Mr. Mohammed's driver partner status to "active."  That activation allowed Mr. Mohammed to proceed with the sign-up process, *i.e.*, sign on to the Uber App and proceed to the "Yes, I agree" screens concerning the Terms. (Moloney Tr. at 21:6-19, 23:13-18; Munion Tr. at 50:15-51:13; Ex. 7; Ex. 8.)

28.    Uber's records demonstrate that the "Yes, I agree" buttons on the driver partner sign-up screens for Mr. Mohammed's driver partner account were clicked "Yes" on October 1, 2014, at 2:38 pm Central time. (Moloney Tr. at 19:18-21:2; Ex. 9, Uber Record of Dates Mohammed Accepted Agreements.)

29.    During the fall of 2014, Mr. Munion assisted approximately ten to thirty driver partners each day he worked in the PSC. (Munion Tr. at 55:14-16.)  Although Mr. Munion does

not recall meeting Mr. Mohammed on October 1, 2014, Mr. Munion is certain he did not deviate from Uber's company practices or his personal practice: That is, when the "Yes, I agree" screens appeared on Mr. Mohammed's smartphone, Mr. Munion handed the phone back to Mr. Mohammed so that he—Mr. Mohammed—could read the contracts if he chose and signal his agreement to them (or not) by clicking the two "Yes, I agree" buttons or "No" buttons. (*Id.* at 54:5-24, 55:4-7.)

30.     Mr. Mohammed claims that when he visited the PSC on October 1, 2014, he never "click[ed] any boxes or accept[ed] any terms" and he never believed he agreed to arbitrate any dispute with Uber. (Mohammed Tr. at 67:10-19.) In particular, Mr. Mohammed claims that the Uber representative he met with on October 1, 2014, logged Mr. Mohammed's driver partner account into two different phones. Mr. Mohammed alleges that he first handed the Uber representative $100 in cash as a deposit, and the representative used Mr. Mohammed's user name and password to log into an Uber-leased phone. (*Id.* at 66:8-25.) Upon learning that Mr. Mohammed already owned an iPhone, however, that representative allegedly took back the Uber-leased phone and returned the $100 cash to Mr. Mohammed. According to Mr. Mohammed, the representative then downloaded the Uber App onto Mr. Mohammed's personal phone, logged in using Mr. Mohammed's user name and password, and returned the phone, saying that Mr. Mohammed was "ready to go to work." (*Id.* at 66:18-67:7.)

31.     Specific details in Mr. Mohammed's version of the events that occurred when he completed the driver partner sign-up process on October 1, 2014, are not consistent with Uber's contemporaneous records from that day or its unrebutted practices that were in effect at that time:

     a.     **Alleged Log-in on a Leased Cell Phone:** Mr. Mohammed claims that the Uber representative who assisted him on October 1, 2014, first logged Mr. Mohammed's user

name and password into an Uber-leased cell phone. (*Id.* at 66:13-19.) If Mr. Mohammed's driver partner account had ever been logged-in to on a leased cell phone, however, Uber would have a record of that log-in in its systems. There is *no indication at all* in Uber's records that Mr. Mohammed's driver account was ever logged-in to a leased cell phone. (Moloney Tr. at 19:5-17.)[2]

        b.    **Alleged Cash Deposit:** Mr. Mohammed claims that he gave the Uber representative who assisted him a $100 cash deposit for a leased cell phone before the representative realized that Mr. Mohammed already owned an iPhone and would not need to lease an iPhone from Uber. (Mohammed Tr. at 66:9-24.) On October 1, 2014, however, Uber required a $200 deposit for leased cell phones, and Uber representatives did not accept deposits in cash; deposits were only handled through electronic debits to the driver partner's account with Uber. (Moloney Tr. at 18:2-19:4.) Mr. Munion testified that he "never" accepted cash deposits from driver partners. (Munion Tr. at 51:20-52:22.) And as discussed above, both Mr. Munion and Mr. Moloney testified that the PSC did not have the facilities in place to handle cash at all. (*See supra* ¶ 24.)

       32.    The Court finds Mr. Moloney's testimony regarding Uber's general practice, and Mr. Munion's testimony regarding his personal practice, that Uber's representatives never clicked the "Yes, I agree" screens concerning consent to the Terms as part of the sign-up process to be credible.

---

[2] The Court stated in its February 14, 2017 opinion that Mr. Mohammed used a leased phone prior to October 1, 2014. *See* Mem. Op. and Order, *Mohammed v. Uber Techs., Inc.*, No. 16 C 2537, 16 n.6 (N.D. Ill. Feb. 14, 2017), ECF 47 ("Feb. 14 Opinion"). However, as the evidence produced at the hearing clarified, there is no dispute between the parties on this issue: Mr. Mohammed never used a leased phone to provide any rides as an Uber driver partner. (Moloney Tr. at 19:5-17; Mohammed Tr. at 66:13-67:7.)

33.     Mr. Mohammad's testimony that he did not click the "Yes, I agree" screens and an Uber representative "logged in" for him (Mohammed Tr. at 67:1-7) is either mistaken or fabricated. As noted above, other details that Mr. Mohammed claims to remember clearly from his October 1, 2014, meeting at the Chicago PSC are not consistent with unrebutted testimony concerning Uber's practices regarding deposits for leased cell phones, nor with Uber's records that Mr. Mohammed's driver partner account was never signed in to a leased cell phone.

34.     In addition, Mr. Mohammed's memory and credibility are seriously called into question by the incidents of exaggeration and/or misrepresentations set forth below in Sections IV and V.

35.     Weighing all of the evidence presented at the hearing, including witness credibility, the Court finds that Mr. Munion complied with Uber Company practices and his personal practices when he met with Mr. Mohammed, and that Mr. Munion did not click the "Yes, I agree" buttons regarding the Terms for Mr. Mohammed.  Mr. Mohammed himself clicked those buttons, consenting to the Terms, including the arbitration provision.

## IV.     Mr. Mohammed Knew That the Terms Governed His Relationship with Uber, and He Accepted Those Terms by Continuing to Access the Uber App.

36.     After Mr. Mohammed completed the driver partner sign-up process on October 1, 2014, he went online in the Uber App later that same day to connect with riders to provide independent transportation services.  From October 1, 2014, until Mr. Mohammed's driver partner account was terminated on June 15, 2015, Mr. Mohammed used the Uber App 2,043 times to connect with riders, and Uber transferred the fares associated with those rides (minus certain fees) to Mr. Mohammed. (Moloney Tr. at 27:1-4; Mohammed Tr. at 90:15-19; Ex. 40).

37.     The entire time Mr. Mohammed had an active driver partner account with Uber, he had access to a copy of the Rasier Agreement through his personal account information found

online at partners.Uber.com (also referred to as the driver partner "portal"). (Moloney Tr. at 24:1-25:7, 27:5-9; Ex. 6, Mohammed Driver Portal Profile Page.)

38. As a driver partner, Mr. Mohammed could access information concerning his account by signing on to partners.Uber.com using his unique username and password. Each driver partner's "portal" at partners.Uber.com provided the driver partner with information about his account. (*See* Ex. 6 (links to portal pages on left side of screen).) For instance, the portal contained the driver partner's trip and payment history—also called the driver partner's "dashboard." (Moloney Tr. at 24:1-6, 28:13-22.) The portal also contained a "profile page," which included personal information concerning the driver partner such as his drivers license, picture, and address. (Ex. 6.)

39. As specifically relevant here, a bolded hyperlink to the Rasier Agreement appeared on Mr. Mohammed's profile page in his online partner portal site. This hyperlink was highlighted with bolded text that was in a different color (light blue) than most of the rest of the text shown on the profile page. The hyperlink read "Rasier Software Sublicense Agreement June 21 2014" and appeared next to a header that read "Contracts." (Ex. 6; Moloney Tr. at 25:1-7.) If Mr. Mohammed had chosen to click on the "Rasier Software Sublicense Agreement June 21 2014" hyperlink on his driver partner profile, it would have taken him to the text of the Terms marked as Exhibit 1. (Moloney Tr. at 24:22-25:7.)

40. Mr. Mohammed does not dispute that a copy of the Terms was available to him during all times that he went online in the Uber App through his driver partner account to connect with riders. Nevertheless, Mr. Mohammed now claims that he did not have knowledge that he had "*any kind of agreement*" with Uber governing his access to the Uber App until March 2016. (Mohammed Tr. at 77:1-10.)

15

41.     The evidence establishes that, contrary to Mr. Mohammed's testimony, he received notice during the time that he had an active driver partner account that he was driving pursuant to Uber's Terms, and Mr. Mohammed was aware of and accessed his online driver partner portal, which contained the hyperlink to those Terms.

42.     On May 2, 2015, for example, an Uber Partner Support representative responded to a complaint from Mr. Mohammed regarding an adjustment made to a trip that Mr. Mohammed had provided to a rider.   The Uber representative told Mr. Mohammed: "Uber *does* have authorization to adjust trips for accuracy **in accordance with the terms and services you agreed to when signing up to drive.**"   (Moloney Tr. at 29:1-30:6; Mohammed Tr. at 77:22-78:10; Ex. 37, May 2, 2015, Email at MOHAMMED 2650 (bold emphasis added).)

43.     Mr. Mohammed does not dispute that he received this May 2, 2015, email from Uber (indeed—Mr. Mohammed not only received the email, he saved it and produced it in this case).   (Mohammed Tr. at 77:15-78:10.)   Mr. Mohammed also does not claim to have responded to this email contending that he never agreed to any terms of service when he opened his driver partner account.   Instead, after Mr. Mohammed received the May 2, 2015, email referencing the "terms and services you agreed to when signing up to drive," Mr. Mohammed accessed the Uber App to connect with riders an additional 413 times.   (*See* Ex. 40.)

44.     Another email exchange between Mr. Mohammed and Uber Partner Support demonstrates that Mr. Mohammed knew of and accessed his online driver partner portal, and Uber advised him to refer to the portal to find information about his driver partner account.   In June 2015, Mr. Mohammed emailed Uber Partner Support, this time complaining that some of his past rides were "missing from the dashboard."   A Partner Support representative responded, indicating that Mr. Mohammed's "complete trip history will always update on your http://partners.uber.com

dashboard." The representative further advised Mr. Mohammed to monitor the partners.uber.com dashboard. (Moloney Tr. at 27:17-28:25; Ex. 36, June 10, 2015, Email at MOHAMMED 2762.)

45. The reference in this email to the "partners.uber.com dashboard" is a reference to the trip and payment history on Mr. Mohammed's driver partner online portal. (Moloney Tr. at 27:17-28:25.) Mr. Mohammed does not dispute that he received this email; nor does he dispute that his complaints to Uber regarding the rides reflected on his online "dashboard" establish that Mr. Mohammed knew of and accessed his driver partner online portal pages.

46. In addition, Mr. Mohammed's testimony that he had *no knowledge* of "any kind of agreement with Uber" is not consistent with his extensive experience in signing up for accounts with technology companies that offer independent transportation providers and delivery drivers with access to technology applications allowing them to connect with riders or other users—all of which have terms and conditions of service that govern access to the applications.

47. Mr. Mohammed's testimony concerning his experience with these other companies also undermines his claims of a "vivid" recollection that during the October 1, 2014, in-person sign-up process at the Uber Chicago PSC he did not see or consent to Uber's terms. In particular, leaving aside the Uber App, Mr. Mohammed claims that he cannot remember whether he agreed to any terms and conditions when he opened accounts with at least four other technology application providers. Mr. Mohammed even claims to have no such memory with respect to accounts he opened much more recently than his Uber driver partner account—in some cases *over a year later*. (*See infra* ¶¶ 48-51.)

48. For example, Mr. Mohammed opened an account to access the application of Uber's then-competitor Sidecar in approximately October 2014, at the same time he signed up for his driver partner account with Uber. At trial, Mr. Mohammed claimed that he could not remember

if he had to agree to terms and conditions with Sidecar, "because I did not sign any hard copy or digital copy." (Mohammed Tr. at 70:6-72-25.)

49.     In approximately December 2015, Mr. Mohammed opened accounts to access the DoorDash and Caviar apps to provide independent delivery services to users seeking restaurant deliveries. At the trial, Mr. Mohammed testified that he did not remember one way or the other whether he agreed to terms and conditions with either DoorDash or Caviar. (*Id.* at 73:6-74:15.)

50.     Mr. Mohammed's claimed lack of memory with respect to the Caviar terms and conditions is particularly telling given the extensive email correspondence he exchanged with Caviar concerning those terms. Indeed, Mr. Mohammed conceded on cross-examination that Caviar referred Mr. Mohammed to its terms and conditions when addressing Mr. Mohammed's various complaints on at least two occasions:

    a.      In July 2016, Mr. Mohammed received an email from Caviar noting that use of a particular delivery bag would help Mohammed "adhere to the terms and conditions of the contract that you signed." Mr. Mohammed admitted that he did not respond to the email disputing that he signed up for any terms and conditions with Caviar.

    b.      In August 2016, Mr. Mohammed received an email from Caviar advising him that certain activities were "a violation of the terms and conditions of the courier contract." Again, Mr. Mohammed admitted that he did not respond and dispute that he agreed to any terms and conditions with Caviar. (*Id.* at 74:23-76:18.)

51.     Mr. Mohammed attempted to reconcile his purported "vivid" recollection that his October 2014 sign-up process with Uber did not include consent to any terms and conditions with his inability to recall whether he agreed to terms and conditions with DoorDash and Caviar in December 2015—over a year after his Uber sign-up process—by contending that the Uber sign-up

process took "around 20 minutes," while "with other people it was not a long process." (*Id.* at 74:16-22.) Mr. Mohammed also testified that other than Uber, the companies with which he opened provider accounts did not have a process "where you went into the office and had someone assist you with the—putting the app on the phone." (*Id.* at 99-1:4.) Mr. Mohammed later admitted, however, that contrary to this testimony he did personally visit Lyft's offices to activate his Lyft account. (*Id.* at 100:6-101:8.)

52. Given that Mr. Mohammed's testimony is inconsistent with Uber's practices and records and his email correspondence with Caviar, the Court finds that Mr. Mohammed's testimony concerning Uber is either mistaken or fabricated.

## V. Mr. Mohammed's Efforts to Defraud Uber Demonstrate That He Is Not Credible.

53. When weighing Mr. Mohammed's testimony concerning his purported recollection of the Uber driver partner sign-up process, the Court also may consider the testimony adduced during his cross-examination in which Mr. Mohammed—in two separate schemes—made false representations in attempts to obtain monetary benefits from Uber.

54. *First,* Mr. Mohammed admitted at trial that, in November 2014, he made false representations in attempts to get both Uber and Lyft to pay him $500 signing bonuses to which he was not entitled.

55. Mr. Mohammed's "signing bonus scheme" stemmed from his knowledge that, at that time, both Uber and Lyft were offering a $500 signing bonus to any driver partners who moved from Uber to Lyft, or vice versa. (*Id.* at 84:1-8.) Attempting to receive a bonus from both companies, Mr. Mohammed emailed both Uber and Lyft in November 2014, demanding a $500 signing bonus from each company. (*Id.* at 87:15-17.)

56.     The emails Mr. Mohammed sent to both Uber and Lyft were nearly identical.  In the Lyft email, Mr. Mohammed wrote:

> Are you expecting to place my signing bonus of $500 on top of my grave? If you so, let me please remind you that if you place my $500 on top of my grave it will be a great injustice.  I expect to get paid by -- my $500 ASAP. Kindly deposit $500 ASAP.  Lyft should start respecting and treating their drivers on par with their customers.  Otherwise the day is not far when all Lyft drivers will called as Uber drivers.

And in the Uber email, Mr. Mohammed wrote:

> Are you expecting to place my signing bonus of $500 on top of my grave? If you so, let me please remind you that if you place my $500 on top of my grave, it will be a great injustice because I worked my back out to use the money while I'm alive. I expect to get paid my $500 ASAP.  Kindly deposit $500 ASAP.  Uber should start respecting and treating their drivers on par with their customers.  Otherway – otherwise the day is not far when all Uber drivers will called as Lyft drivers.

(*Id.* at 85:9-18, 86:11-87:22.)

57.     Mr. Mohammed admitted on cross-examination that he sent these emails for the purpose of retrieving a $500 signing bonus from *both* Uber and Lyft:

> Q:     So you switched some of the words little bit but basically sent the same e-mail to both Uber and Lyft trying to get your $500.
>
> A:     Yes.

(*Id*. at 87:15-18.)

58.     On redirect examination, Mr. Mohammed claimed that the terms of the promotions Uber and Lyft were offering at the time did not require a driver partner to leave one company to receive the bonus for signing up with the other.  (*Id.* at 99:6-25.)  Even if that were true, however, the undisputed evidence establishes that Mr. Mohammed made at least two separate misrepresentations as part of his attempted "signing bonus scheme."

59.     As Mr. Mohammed explained the signing bonus promotions, Uber offered a signing bonus to current Lyft drivers who opened a new driver partner account with Uber, and Lyft

offered a signing bonus to current Uber drivers who opened a new driver partner account with Lyft. (*Id.*) There is no possible scenario in which Mr. Mohammed could be entitled to such a signing bonus from both Uber and Lyft. Either Mr. Mohammed was an active Uber driver partner when he signed up with Lyft, or he was an active Lyft driver partner when he signed up with Uber. As Mr. Mohammed surely knew, he could not qualify for signing bonuses from both. Therefore, when Mr. Mohammed sent the November 2014 emails to Lyft and Uber attempting to get *both* of them to pay him a $500 signing bonus, he was dissembling to at least one of them.

60.     In addition, even if it was not necessary to receive the promotion, Mr. Mohammed falsely told Lyft as part of the "signing bonus scheme" that he had moved to Lyft and left Uber. In particular, in a November 6, 2014, email to Lyft, Mr. Mohammed wrote: "I am still waiting for the $500 signing bonus which Lyft promised me *when I moved from Uber to Lyft* . . . . Please deposit my $500 signing bonus as soon as possible." (*Id.* at 84:15-85:6 (emphasis added).) Mr. Mohammed's representation to Lyft that he had "moved from Uber" was false. The record is undisputed that, at the time, Mr. Mohammed was regularly accessing the Uber App to connect with riders. (*See, e.g.*, *id.* at 99:22-25; Ex. 40.)

61.     Notwithstanding that Mr. Mohammed admitted sending this November 6, 2014, email to Lyft, Mr. Mohammed claimed on redirect that he never told Lyft he was "no longer driving for Uber." (Mohammed Tr. at 99:19-21.) When confronted with the fact that his testimony at the hearing directly contradicted the email he wrote in 2014, Mr. Mohammed unpersuasively claimed he did not mean what he wrote. (*Id.* at 101:9-102:2.)

62. *Second*, on the same afternoon he sent emails to Uber and Lyft in furtherance of the "signing bonus scheme," Mr. Mohammed began creating fraudulent Uber rider accounts for the purpose of defrauding Uber of promotional bonuses and additional fares.[3]

63. Mr. Mohammed admitted on cross-examination that on November 9, 2014, he claimed to provide a ride to a person named "Jose Salazar" which began in a parking lot very close to Mr. Mohammed's home and then drove approximately 11 miles only to end up back in the same parking lot. Mr. Mohammed also admitted that the fare "Jose Salazar" paid was $20.62, just above the free promotion Uber was offering to new riders at the time. When asked to confirm that his testimony to the Court was that "Jose Salazar" was a real person, Mr. Mohammed responded that he did not remember. (*Id.* at 92:2-94:13.)

64. Mr. Mohammed testified that, less than an hour after the "Jose Salazar" ride, he picked up an alleged rider named "Tom Yardley" and drove him in a 13-mile circle that ended basically where it started (again near Mr. Mohammed's apartment). The fare for the "Tom Yardley" ride was $20.27, again just barely above the promotion code value. (*Id.* at 94:14-97:18.)

65. Mr. Mohammed further testified about the Salazar and Yardley accounts as follows:

Q:     Now, are you aware, sir, that these accounts were almost immediately banned by Uber as fraudulent? Yes or no?

A:     I don't know.

Q:  Are you aware, sir, that based on Uber's records, not a single person who allegedly opened an account and had it banned called and complained that their account had just been banned?

---

[3] At the conclusion of the June 14 hearing, the Court held that it would only consider evidence related to Mr. Mohammed's rider fraud activities for purposes of evaluating Mr. Mohammed's credibility. Uber maintains that evidence concerning the Uber rider account sign up process, which required consent to Uber's rider terms and conditions, is substantively relevant to the question of whether Mr. Mohammed knew of and accepted Uber's driver-partner terms and conditions. (*See, e.g.*, Hawkins Tr. at 132:23-133:4.) Uber reserves all rights related to this issue, including to the Court's exclusion of the testimony of Uber employee James Hawkins (Hawkins Tr. at 112-146 (Uber offer of proof)), and Uber does not intend to waive any arguments by following the Court's instruction not to re-raise those arguments in this filing. (Tr. at 149:23-150:8.)

A:     It's none of my business.

Q:     They didn't email.  You're aware of that?

A:     I don't know.

Q:     Because you set up these accounts, sir, and they're not real people, isn't that right?

A:     I don't know.

(*Id.* at 97:20-98:6.)

66.     On cross-examination, Mr. Mohammed also admitted that his Facebook profile inaccurately states he studied at Stanford University.  (*Id.* at 69:2-7.)  Mr. Mohammed never attended Stanford. (*Id.* at 68:10-11.)  He tried to explain the misrepresentation on his profile page by stating that it "might be" an accident: "Maybe I tried to click something else. . . ."  (*Id.* at 69:10-17).

67.     Mr. Mohammed admitted on cross-examination to a pattern of behavior in which he makes outrageous allegations of persecution and unfair treatment, further impugning his credibility in the instant case.  For instance, Mr. Mohammed has claimed that:

- Sidecar called him a terrorist and threatened to implicate him in false criminal charges. (*Id.* at 83:2-7.)

- Capital One used racial epithets against him. (*Id.* at 83:8-10.)

- An employee of the Hamdard Center, a charitable organization, has plans to hire a hitman to rough him up, and has been spreading the rumor that Mr. Mohammed provided the U.S. government with evidence that led to the location of Osama Bin Laden.  (*Id.* at 83:13-20.)

## PROPOSED CONCLUSIONS OF LAW

**I.     This Court Should Compel Arbitration Because Uber Has Established by a Preponderance of the Evidence That Mr. Mohammed Agreed to the Terms.**

68.     "Under the Federal Arbitration Act, arbitration may be compelled if the following three elements are shown: a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005); *see Bahoor v. Varonis Sys., Inc.*, 152 F. Supp. 3d 1091, 1097 (N.D. Ill. 2015).[4]

69.     A party opposing a motion to compel arbitration shoulders the burden in response to that motion to raise specific evidentiary facts "identifying a triable issue of fact as to the existence of the purported arbitration agreement."   Feb. 14 Opinion at 5-6 (citing *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002).   In motion practice, the court must accept as true the nonmovant's claims and draw all justifiable inferences in his favor.  *Id.*  If the nonmovant

---

[4] Mr. Mohammed has not argued that the disputes at bar fall outside the scope of the arbitration agreement; he simply asserts that he and Uber did not form this agreement at all.  To the extent Mr. Mohammed asserts that these disputes fall outside the scope of the arbitration agreement, his assertion is without merit.  "Arbitration clauses containing the phrase 'arising out of' . . . are extremely broad and 'necessarily create a presumption of arbitrability.'" *Sanchez v. CleanNet USA, Inc.*, 78 F. Supp. 3d 747, 753 (N.D. Ill. 2015) (citation omitted); *see Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1034 (7th Cir. 2012) ("'[A]rising out of or relating to' [is] language [that is] extremely broad and capable of an expansive reach . . . . Such broad language necessarily create[s] a presumption of arbitrability, which requires that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." (internal quotation marks omitted)) (citations omitted).  Here, the applicable Terms language states:

> [T]his Arbitration Provision applies to any dispute *arising out of or related to* this Agreement or termination of this Agreement and survives after the Agreement terminates . . . . **Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration** . . . . Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to disputes arising out of or related to this Agreement and disputes arising out of or related to your relationship with the Company, including termination of the relationship.  This Arbitration Provision also applies, without limitation, to disputes regarding any city, county, state or federal wage-hour law, . . . compensation, . . . harassment and claims arising under [various federal legislation, including the Civil Rights Act of 1964 and Fair Labor Standards Act], . . . and state statutes, if any, addressing the same or similar subject matters, and all other similar federal and state statutory and common law claims.

(Ex. 1 at 12 (quoting the Terms' Arbitration Provision) (italic emphasis added).)

carries this burden, "the court shall proceed summarily to the trial" regarding the issue of fact as to the existence of the arbitration agreement. 9 U.S.C. § 4.

70.     At a hearing held under Title 9 U.S.C. § 4 to determine if the parties formed an arbitration agreement, the court evaluates whether the movant has shown the existence of an arbitration agreement—offer, acceptance, and consideration—by the preponderance of the evidence standard. *See Cwik v. First Stop Health, LLC*, No. 12 C 6238, 2016 WL 1407708, at *4-5 (N.D. Ill. Apr. 10, 2016); *see also Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) ("As the party seeking to compel arbitration, Samsung bears 'the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.'" (quoting *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014))); *Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir. 2012) ("The party seeking to compel arbitration need only prove the existence of an agreement to arbitrate by a preponderance of the evidence.") (citation omitted). Under the preponderance of the evidence standard, it "must simply be 'more likely than not'" that Uber and Mr. Mohammed agreed to a contract that contains an arbitration clause. *See Schaudt v. United States*, No. 12 CV 3301, 2013 WL 951138, at *7 (N.D. Ill. Mar. 11, 2013) (Lee, J.) (citing *Ojeda v. Goldberg*, 599 F.3d 712, 716 (7th Cir. 2010); *Brown v. Bowen,* 847 F.2d 342, 345-46 (7th Cir. 1988)).

71.     In this case, only the first element of *Zurich*'s three-part test—the formation of a written agreement to arbitrate—is in dispute. Once that element is established, it is undisputed that the second and third elements of this test have been met. The Terms contain a broad arbitration agreement (*see supra* ¶¶ 10, 68 n.4), and Mr. Mohammed refuses to arbitrate his dispute with Uber.

72.     To determine whether Uber and Mr. Mohammed entered into a contract that contains an arbitration clause, this Court applies Illinois law of contract formation. In particular,

25

the Court examines whether the well-known contract formation of offer, acceptance, and consideration have been shown.  *See* Feb 14 Opinion at 12.  As Judge Lefkow explained in *Collier v. Real Time Staffing Servs., Inc.*, No. 11 C 6209, 2012 WL 1204715, at *2 (N.D. Ill. April 11, 2012):

> To determine whether a contract's arbitration clause applies to a given dispute, federal courts apply state-law principles of contract formation.  *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012).  Under Illinois law, "[a]n agreement to arbitrate is treated like any other contract," *Vassilkovska v. Woodfield Nissan, Inc.*, 830 N.E.2d 619, 623 (Ill. App. Ct. 2005), in other words, there must be "offer, acceptance and consideration."

73.     As part of considering the testimony proffered by the parties on the elements of contract formation, the Court assesses the credibility of each witness.  *See, e.g.*, *Thompson v. United States*, 436 F. App'x 669, 675 (7th Cir. 2011), *as amended on denial of reh'g* (Dec. 9, 2011) (affirming district court's determination that witness was not credible due to his "history of lying and fraud").

74.     The facts and the law compel the conclusion that Uber has established by a preponderance of the evidence that Mr. Mohammed agreed to the Terms and their arbitration provision in two independently sufficient ways:

a.     *First*, Mr. Mohammed is bound to the Terms because he clicked the "Yes, I accept" buttons when he signed up to be a driver partner on October 1, 2014.  (*See supra* ¶¶ 5-35.)  As a matter of law, Mr. Mohammed cannot avoid arbitration by claiming that he never read the Terms or never knew they contained an arbitration provision.

b.     *Second,* although Mr. Mohammed's October 1st agreement to the Terms is sufficient to bind him, Mr. Mohammed's subsequent conduct bound him to the Terms as well.  Mr. Mohammed was put on notice of the Terms on several occasions after October 1, 2014, and he

continued to accept rides as a driver partner and reap the benefits of his agreement with Uber. (*See supra* ¶¶ 36-52.) As a matter of law, this conduct bound Mr. Mohammed to the Terms.

## II. It Does Not Matter If Mr. Mohammed Failed to Read the Terms Generally or the Arbitration Provision Specifically.

75. "Basic contract law" provides that parties have a duty to read contracts they sign. *Heller Financial, Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1292 (7th Cir. 1989) ("Basic contract law establishes a duty to read the contract; it is no defense to say, 'I did not read what I was signing.'"); *see Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379, 385 (7th Cir. 2007) ("This is basic contract law: one cannot accept a contract and then renege based on one's own failure to read it."). Accordingly, a party who accepts a written contract is presumed to have notice of all of the contract's terms. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). This general rule also applies to electronic contracts so long as the signer is put on notice of the terms. *See id.* at 1033 (noting that an "electronic 'click' can suffice to signify the acceptance of a contract"); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 (2d Cir. 2002); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012) (holding that whether a party clicks through to review hyperlinked terms "is irrelevant").

76. Under Illinois contract law, the signer of an electronic contract is bound to its terms if he had *reasonable notice* that his "click on a button constitute[d] assent to an agreement." *Sgouros*, 817 F.3d at 1036.

77. In *Sgouros*, the Seventh Circuit applied a two-part test to determine whether online contracts provide reasonable notice of their terms. *Id.* at 1034 (applying Illinois law). This test asks (1) "whether the web pages . . . adequately communicate all the terms and conditions of the agreement," and (2) "whether the circumstances support the assumption that the [user] receive[d] reasonable notice of those terms." *Id.* at 1034. Factors relevant to assessing these two parts include

the presence of a clear statement that a transaction is subject to terms and conditions, the proximity of that statement to the button the consumer needs to click to continue, the clarity of the label of the terms and conditions, a clear prompt directing the user to read hyperlinked terms, and buttons that use language of assent (such as "I Agree").  *Id.* at 1035-36 (holding that "a clearly labeled hyperlink to the agreement, next to an 'I Accept' button that unambiguously pertains to that agreement" would be sufficient to bind users to a service agreement).

78.     In *Hubbert v. Dell Corp.*, 835 N.E.2d 113 (Ill. App. Ct. 2005), the Illinois Court of Appeals similarly determined that a consumer had assented to terms of sale when he purchased a computer on Dell's website.  835 N.E.2d at 122.  The court found that "the blue hyperlinks on the defendant's Web pages, constituting the five-step process for ordering the computers, should be treated the same as a multipage written paper contract."  *Id.* at 121.  The last three pages of Dell's checkout process included language stating: "All sales are subject to Dell's Terms and Conditions of Sale."  *Id.* at 118.  Based on this information, the court found that the consumer was on notice of the hyperlinked terms of sale and his completion of the purchase manifested assent to those terms. *Id.* at 122.

79.     Every other court to have considered the issue has found that Uber's two "Yes, I agree" screens provide Uber's driver partners with reasonable notice of the hyperlinked terms and bind them to the arbitration provision set forth therein.  *See Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1197 (N.D. Cal. 2015), *aff'd in part, rev'd in part, and remanded*, 836 F.3d 1102 (9th Cir. 2016) (reversed on other grounds) (finding that a substantively identical first driver partner sign-up screen rendered the existence of the relevant contracts conspicuous, and thus plaintiff driver partners had assented to the terms by clicking the agreement button); *see also Carey v. Uber Techs., Inc.*, No. 1:16-CV-1058, 2017 WL 1133936, at *4-5 (N.D. Ohio Mar. 27, 2017)

(holding that plaintiff accepted Uber's Terms by clicking through the driver partner sign-up screens); *Cubria v. Uber Techs., Inc.*, No. A-16-CA-544-SS, 2017 WL 1034731, at *5 (W.D. Tex. Mar. 16, 2017) (finding that the sign-up process put plaintiff driver partner on reasonable notice of Uber's terms); *Kai Peng v. Uber Techs., Inc.*, No. 16-CV-545 (PKC) (RER), 2017 WL 722007, at *7-8 (E.D.N.Y. Feb. 23, 2017) (finding plaintiff driver partners' assent to Uber's terms to be explicit because they were "required to *twice* click buttons labeled, 'YES, I AGREE,' and were clearly and repeatedly encouraged to click on the contract containing the terms to which they were agreeing"); *Saizhang Guan v. Uber Techs., Inc.*, No. 16-CV-598 (PKC) (CLP), 2017 WL 744564, at *8 (E.D.N.Y. Feb. 23, 2017) (finding same); *Singh v. Uber Techs., Inc.*, No. CV 16-3044 (FLW), 2017 WL 396545, at *5 (D.N.J. Jan. 30, 2017) (compelling arbitration and finding plaintiff driver partner had sufficient notice of the terms); *Richemond v. Uber Techs., Inc.*, No. 16-CV-23267, 2017 WL 416123, at *3 (S.D. Fla. Jan. 27, 2017) (finding that plaintiff driver partner "clearly acceded" to Uber's terms by clicking through the two sign-up screens).

80.     As set forth above, this Court has made a finding of fact that Mr. Mohammed himself clicked the "Yes, I agree" buttons in the Terms-related screens that are part of Uber's driver partner account sign-up process. This Court also finds, as a matter of law, that Uber's sign-up process put Mr. Mohammed on reasonable notice of the hyperlinked Terms, and his completion of the sign-up process manifested assent to the Terms.

81.     The clear language and layout of Uber's driver partner sign-up process put Mr. Mohammed on reasonable notice of the Terms. Uber's two "Yes, I agree" screens meet all of the hallmarks of reasonable notice discussed in *Sgouros* and *Hubbert*:

(a)     The first "Yes, I agree" screen contained a clear statement that the agreement was subject to the terms of certain contracts, including the Terms, provided a clear

prompt to Mr. Mohammed directing him to read the hyperlinked terms, and contained a nearby button using clear language of assent. (*See supra* ¶¶ 8-9, 12-13.)

(b)　　Although the first "Yes, I agree" screen would be sufficient to put Mr. Mohammed on reasonable notice of the Terms, the Uber sign-up process also included a second "Yes, I agree" screen. Like the screen before it, this second screen also contained a clear statement that the agreement was subject to the hyperlinked contracts and a nearby button using clear language of assent. (*See supra* ¶¶ 8-9, 12-13, 14.)

82.　　Therefore, all of the necessary elements of contract formation have been met. Uber made an offer to Mr. Mohammed which provided that his access to the Uber App would be governed by the Terms. Mr. Mohammed accepted that offer, and his access to the lead generation services provided by the App to connect with riders constituted valuable consideration. In sum, by clicking "Yes, I agree," Mr. Mohammed bound himself to the Terms, including the arbitration agreement, whether or not he read them.

## III.　Alternatively, Mr. Mohammed's Repeated Acceptance of the Benefits of Access to Uber's App While on Notice of the Terms Also Constitutes a Binding Agreement to Arbitrate.

83.　　A party to a contract "may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it." Feb. 14 Opinion at 15 (quoting *Landmark Props., Inc. v. Architects Intl'l-Chi.*, 526 N.E.2d 603, 606 (Ill. 1988)); *see also Bauer v. Qwest Commc'ns Co., LLC*, 743 F.3d 221, 227-28 (7th Cir. 2014) (citing Restatement (Second) of Contracts Section § 69(1)(a)).

84.　　In order for conduct to constitute acceptance of a contract, there must be "evidence that the party took the benefits with knowledge of those terms." Feb. 14 Opinion at 15-16; *see also Treiber*, 474 F.3d at 385 (7th Cir. 2007) ("It is standard contract doctrine that when a benefit

is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree.") (citations omitted).  In other words, as this Court has explained, a party will be deemed to have accepted a contract by conduct if he "knew or should have known of its terms."  Feb. 15 Opinion at 17.

85.　　As detailed above, the evidence adduced at the hearing established as a factual matter that, for an eight month period, Mr. Mohammed used his driver partner account to go online in the Uber App and accept the benefit of the App's lead generation services to connect with riders seeking independent transportation services in exchange for fares paid by the riders (minus certain fees).  During this time period, Mr. Mohammed had constant access to the Terms via a conspicuous hyperlink to the Terms provided under the heading "Contracts" on his online driver portal profile page.  The evidence further established that Mr. Mohammed knew of and accessed his online driver portal and had a general understanding based on his experience with technology applications that access is conditioned upon the agreement to the application provider's terms and conditions. (*See supra* ¶¶ 36-40, 44-45.)

86.　　In addition, Mr. Mohammed cannot dispute that he had specific knowledge of the fact that his access to the Uber App was governed by terms and conditions of service after May 2015, when he was specifically notified of that fact in an email from an Uber Partner Service representative.  (*See supra* ¶¶ 42-43.)

87.　　As noted above, Uber has established by a preponderance of the evidence that Mr. Mohammed personally clicked the "Yes, I agree" screens as part of the driver partner sign-up process and consented to the Terms.  (*See supra* ¶¶ 25-35.)  Regardless, Mr. Mohammed's conduct binds him to the Terms.  Uber has shown by a preponderance of the evidence that despite being

repeatedly placed on notice of the Terms, Mr. Mohammed continued to accept the benefit of that agreement.  (*See supra* ¶¶ 36-51.)

## CONCLUSION

88.     Uber has proved by a preponderance of the evidence that Uber and Mr. Mohammed entered into a contract that contains an arbitration agreement.  In particular, this Court finds that Mr. Mohammed agreed to the Terms in the following alternative ways:

(a)     Mr. Mohammed agreed to the Terms on October 1, 2014, when he clicked the "Yes, I agree" buttons on the driver partner sign-up screens, indicating that he understood that his access to the lead generation services provided online in the Uber App was conditioned upon his consent to the Terms.

(b)     Mr. Mohammed agreed to the Terms each time he used his driver partner account to sign on to the Uber App to connect with riders, because Mr. Mohammed knew that his access to the App was conditioned upon his agreement to the Terms.  The preponderance of the evidence establishes that Mr. Mohammed was on notice of Uber's Terms through the link on his online driver portal, his emails with Uber Partner Support, and his experience with opening accounts with Uber and other similar technology application providers.

85.     Because the Court finds that Mr. Mohammed agreed to a contract with Uber covering his driver partner account and use of the Uber App which contains an arbitration provision, the Court grants Uber's motion to compel arbitration.

Dated:  July 14, 2017                    By:   /s/  Reid J. Schar

                                         Reid J. Schar
                                         Megan B. Poetzel
                                         JENNER & BLOCK, LLP
                                         353 N. Clark Street
                                         Chicago, IL 60654
                                         Tel:    (312) 222-9350
                                         Email:  rschar@jenner.com
                                                 mpoetzel@jenner.com

                                         *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 14, 2017, I caused a true and correct copy of the foregoing Uber Technologies, Inc.'s Proposed Findings of Fact and Rulings of Law in the Dispute Regarding Contract Formation to be served via the Court's electronic filing system notice to registered users and via electronic mail to the following:

Michael Paul Persoon
Despres Schwartz & Geoghegen
77 W. Washington Street
Chicago, Illinois 60602
Telephone: (312) 372-2511
mike.persoon@dsgchicago.com

By: ___/s/ Megan B. Poetzel_____