# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Abdul Mohammed, | )<br>) |
|     *Plaintiff,* | )    Case No. 16-cv-2537<br>) |
| v. | )    Judge John Z. Lee<br>) |
| Uber Technologies, Inc., *et al.*, | )<br>) |
|     *Defendants.* | )<br>) |

## Plaintiff's Post-Trial Brief

### Introduction

    The defendants (referred to collectively by the singular "Uber") have a wonderful product. But Uber's business practices leave much to be desired. As an aggressive, disruptive technology start-up in 2014, Uber was results driven. The result it needed in 2014 was to sign-up as many drivers as possible to build a virtual taxi fleet. To accomplish that goal, its employees were taught to "always be hustlin" – to do whatever it took to sign-up as many drivers as they could.

    Uber's insistence on using a "Yes, I agree" button on a mobile phone to have the drivers it signed up agree to an arbitration clause caused the evidentiary dispute that was the subject of the trial.[1] And at that trial, there was testimony from the plaintiff, Abdul Mohammed, that he never agreed to the terms included in Def. Ex. 1, that he never had to click the "Yes, I agree" button, and that he never agreed to arbitrate his disputes with Uber. No one testified that they saw him click the button, or that Uber ever directly communicated the terms to him. Instead, all that Uber could

---

[1] In this case, there is not a stand-alone arbitration agreement. Instead, the alleged contract/agreement is the "Rasier Software Sublicense & Online Services Agreement" (Def. Ex. 1). That agreement contains an arbitration clause.

show was that *someone* clicked (or maybe accidentally touched) the "Yes, I agree" button on the phone that Mohammed used as a taximeter while driving for Uber and that its terms were "available" to Mohammed to seek out and view. On all the evidence, it cannot be said that Uber and Abdul Mohammed formed an agreement to arbitrate their disputes.

## Summary of Relevant Evidence

To establish the existence of a contractual agreement to arbitrate, Uber must show: (1) it communicated an offer to arbitrate to Mr. Mohammed, (2) he accepted that offer by words or conduct, and (3) the resulting agreement was supported by adequate consideration. But at the trial, no one testified that they communicated an offer to arbitrate disputes to Mr. Mohammed. No one testified that Mr. Mohammed accepted an offer to arbitrate. And there was no documentary evidence showing either a communication of the offer by Uber or acceptance by Mohammed.

Instead, Uber relies on a few thin reeds to show that it formed an agreement containing an arbitration clause with Mr. Mohammed.

- Documents showing that its "driver partner sign-up screens" require someone to agree to Uber's terms (including the arbitration clause) by clicking "Yes, I agree" twice. Uber Brief at 7.

- Brian Moloney's testimony that Uber has a company practice that each driver partner had to personally click on the aforementioned "Yes, I agree" buttons. Uber Brief at 8.

- Shea Munion's testimony that he never clicked the "Yes, I agree" buttons for a driver partner and that he always made sure to give the phone to the driver partner so that the driver partner could review the terms. Uber Brief at 9.

- Mr. Mohammed had the terms "available" to him at all times through the driver portal, that he was aware his relationship with Uber was governed by some terms in the abstract, and that he therefore accepted the terms made available through the driver portal by continuing to drive for Uber even if he never read them himself. Uber Brief at 12-13.

Against these reeds presses Mr. Mohammed's own testimony. Mohammed testified without contradiction that he never was offered and never accepted the terms containing the arbitration

2

clause. That is, he was never offered and he never accepted the "Raiser Software Sublicense & Online Services Agreement" entered into evidence as Defendants' Exhibit 1 – the only possible source of an obligation to submit to arbitration. Mohammed testified to the following:

- He learned of Uber in the middle of 2014 by word of mouth, and decided to drive for Uber in roughly July 2014. Tr. 64.

- He applied to drive for Uber by going to its website, creating a username and password, and consenting to a background check. Tr. 64 (consent to background check); Tr. 66 (username and password).

- Uber informed him passed the background check, but he waited a few months to start driving because he did not have a car that met Uber's requirements. Tr. 64.

- In October 2014, after getting a car that met Uber's requirements, Mohammed went to Uber's Chicago office at 300 N. Elizabeth St. Tr. 65.

- At the office, Uber had him watch training videos in a group and when he was finished, a driver support representative called his name to complete the sign-up process. Tr. 65. That representative was Shea Munion. Tr. 22-23 (testimony of Brian Moloney), Def. Ex. 8.

- Mohammed provided Munion with his registration documents, car registration and insurance. Tr. 65.

- Munion told Mohammed that he needed different pictures of his car to complete the sign-up process, and shoed Mohammed what the pictures should look like. Tr. 65.

- Mohammed left the Uber office, took new pictures of his car, and returned to the Uber office where Munion approved the pictures and resumed the sign-up process. Tr. 65-66.

- Munion finished helping another driver and then returned to Mohammed, telling him that Uber required a one-hundred dollar deposit for the phone. Tr. 66.

- Mohammed handed Munion one-hundred dollars but the deposit was never processed because Munion noticed Mohammed had his own iphone. Tr. 66.

- Munion walked away and returned with a phone and told Mohammed to give him the username and password that he set up when he consented to the background check. Tr. 66.

- Upon receiving the email and password from Mohammed, Munion used Mohammed's information to log in to the phone. Tr. 66.

3

- Munion then noticed Mohammed had his own iphone. Tr. 66-67.

- Mohammed handed his personal iphone to Munion. Munion downloaded the Uber app on to Mohammed's phone, again asked for Mohammed's username (his email) and his password, which Munion used to log in to the Uber application on Mohammed's phone. Tr. 67.

- Munion handed Mohammed back his phone, which was already operating the Uber application, and told Mohammed he was all set to go to work. Tr. 67.

- At no point did Munion ask Mohammed to click any box on the phone.

- At no point did Munion mention arbitration to Mohammed. Tr. 67; *see also* Tr. 56 (Munion testifying that he did not tell drivers they were agreeing to arbitration).

- Mohammed did not have to accept any terms when he started a shift driving for Uber. Tr. 67.

- Mohammed never subjectively believed he had agreed to arbitrate any dispute with Uber as a driver. Tr. 67.

If the Court credits Mohammed's testimony as set forth above, it cannot find he agreed to t arbitration clause set forth in Def. Ex. 1, or otherwise agreed to arbitrate his disputes with Uber. But even if there is some doubt as to Mohammed's memory or what happened two or three years ago, no one testified that they saw Mohammed click the "Yes, I agree" box. Uber is left to rely on Munion's "habits" or Uber's "practices" under Fed. R. Evid. 406 to suggest that *it must be the case* that Mohammed did click the "Yes, I agree" box because no one else did for him. But Uber's attempts to credibly suggest that it had established company practices that were followed without deviation fall flat.

Uber is an aggressive technology company willing to break rules to secure a monopoly position in the rideshare market. *See, e.g.,* Case No. 3:17-cv-00261 (N.D. Cal.)($20 million settlement with FTC related to misrepresentations about driver income). Among the values it passes on to its employees is to "always be hustlin" which is understood to mean to "do your best efforts in what

it takes to *get whatever the job is in front of you accomplished*." Tr. 38 (Moloney, emphasis supplied).

Uber does not provide any formal training to its employees like Shea Munion, who sign-up drivers like Abdul Mohammed. Shea Munion admitted this directly: "Yeah, this was – this wasn't a formal training. This was a here is how you do it. Let me sit down and show you how to do this." Tr. 57 (Munion). As Munion testified, the training consisted of a walkthrough on how to technically sign someone up:

Q: And what did the training consist of substantively?

A: Walking through, for example, the checklist, how to upload pictures, or enter profiled information, how to add a deposit to a partner's phone, or user profile. At what point the profile should be activated.

Tr. 57 (Munion).

Neither Moloney nor Uber actually monitored how Shea Munion performed his duties. There was zero quality control put in place to ensure any alleged policies were followed. Moloney testified that he personally spent "zero" percent of his 16 hours a week at the Uber office watching other reps and had no knowledge of Uber performing any quality control checks on Munion. Tr. 35-36 (no quality control checks); 46 (zero percent of his time observing other representatives like Munion). The trial showed that either Uber has no standard practice relating to how to sign-up drivers or at least the witness offered show this practice – Brian Moloney – had no knowledge of them. Furthermore, even if Uber did have such practices, its failure to do any monitoring or qualify control on the actual implementation of these practices precludes it from asserting those practices under Fed. R. Evid. 406. And either no policies were actually written, or if they were then they were not placed in evidence. *See* Tr. 57 (Munion testifying about "written documents" including a "checklist to follow"). Moloney testified that one person – Andrew Green – told him that he

should not accept or agree to the partner agreement, but that there was no posting about that supposedly key requirement. Tr. 46-47 (Moloney).

Finally, the evidence admitted at trial shows that Uber did not promise any definite terms to Mohammed. This is because in the terms offered in the agreement (Def. Ex. 1), Uber reserved for itself the extraordinarily greedy right to modify any and all terms at any time, with no actual notice, *including the arbitration clause*. Uber's terms set this right out on p. 16 of Def. Ex. 1:

> **Modifications**
>
> The Company reserves the right to modify or supplement the terms and conditions of this Agreement at any time, effective upon publishing a modified version of this Agreement, or upon publishing the supplemental terms to this Agreement, on the Software or via email or on you online Partner Dashboard.
>
> You hereby expressly acknowledge and agree that, by using or receiving the Service, and downloading, installing or using the Software, you and Company are bound by the then-current version of this Agreement, including any modifications and supplements to this Agreement or documents incorporated herein. Continued use of the Service or Software after any modifications or supplements to the Agreement shall constitute your consent to such modifications and supplements. You are responsible for regularly reviewing this Agreement.

Def. Ex. 1.

## Argument

This case turns on three factual findings: (1) did Uber communicate an offer of terms to Mr. Mohammed, (2) did Mr. Mohammed communicate his acceptance of those terms to Uber, and (3) was there adequate consideration to support the agreement. Uber failed to meet its burden to establish these basic elements and the Court should make its findings of fact and conclusions or law accordingly, rule in Mr. Mohammed's favor, and allow the case to proceed upon an amended complaint. *See, e.g., Steinberg v. Chicago Medical School*, 371 N.E.2d 634, 639 (Ill. 1977)(offer,

acceptance, consideration); *Landmark Props. Inc. v. Architects Int'l.-Chi.*, 526 N.E.2d 603, 606 (Ill. 1988)(acceptance by conduct).

**I.     Uber did not communicate an offer to arbitrate to Mohammed.**

An offer is a communication of a willingness to make an agreement, with definite material terms. *See, e.g., Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991) (quoting Williston and Corbin). As shown above in discussing Uber's reserved right to change any and every term in the agreement, Uber did not communicate "definite" terms to Mohammed and therefore there are no facts on which the Court can find Uber made an actual offer under Illinois law. *See W.E. Erickson Constr. v. Chicago Title Ins. Co.*, 641 N.E.2d 861, 864 (Ill. App. 1994)("An illusory promise appears to be a promise, but on closer examination reveals that the promisor has not promised to do anything."). The Illinois Pattern Jury Instructions make the same point, stating that "An 'offer' is a communication of a willingness to enter into a contract." Ill. Pattern Jury Instructions, Sec. 700.03 ("Proof of Formation of Contract"). Those same instructions require that the "communication" of the offer "must have included a definite promise" and that "the important and necessary terms must be definite." *Id.* But where an offeror reserves for itself the unfettered right to unilaterally change all the terms, they are not "definite." *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 316 (6th Cir. 2000). In *Ryan's Family Steak Houses*, the Sixth Circuit found a promise to be illusory where one party reserved itself the right to unilaterally change the terms of the deal, quoting Prof. Williston for the proposition that:

> Where a promisor retains an unlimited right to decide later the nature or extent of his performance, the promise is too indefinite for legal enforcement. The unlimited choice in effect destroys the promise and makes it merely illusory.

*Ryan's Family Steak Houses*, 211 F.3d 316. And while this "illusory promise" analysis is usually performed in the context of consideration, *see infra,* the fact that the "offer" was rendered

7

indefinite by the inclusion of the "modification" clause makes it appropriate to also show there was no offer because an offer must be definite as to the material terms.

But even if the material terms were "definite," they were not communicated to Abdul Mohammed. His testimony is unrebutted on this point. Brian Moloney did not testify that the terms were offered to Mohammed. Neither did Shea Munion. At best, Uber argues that the terms were always "available" for Mr. Mohammed to seek out inside his "driver portal," but there is no evidence suggesting that Uber ever directed him to do so. Yes, there was one email where Uber told Mohammed that there were terms, but that is not the same thing as a communication of an "offer" of "definite" terms.

**II.     Mohammed never communicated his acceptance of the terms to Uber.**

Uber has two theories for how Mohammed accepted its offer of terms. *First*, it claims that he did in fact click the "Yes, I agree" button when his phone was set up to act as a taximeter. But it presented literally no evidence showing that he did, other than the fact that its records reflect that *someone* clicked the button and that its alleged practices and Shea Munion's alleged habits would have required him to. But as shown in the statement of facts, Uber has not shown by competent evidence that it has such a habit. Brian Moloney testified that he learned of the important Uber rule that the driver himself click the "Yes, I agree" button from Andrew Green. But the alleged statement of Andrew Green is inadmissible hearsay. And – curiously for a large corporation trying to prove a practice – it put on no evidence of any driver actually clicking the "Yes, I agree" button. It offered only the testimony of Shea Munion to say it was his habit to have the driver click the button. But there is literally no evidence in the record to show a single driver clicked the "Yes, I agree" button. Uber cannot establish either that it had a practice under Fed. R. Evid. 406 or that Shea Munion had such a "habit" on this record. Nor has it rebutted Mohammed's testimony that he did not click the "Yes, I agree" button.

*Second*, Uber claims Mohammed accepted its terms – including the arbitration clause – by his conduct, citing *Landmark Props. Inc. v. Architects Int'l.-Chi.*, 526 N.E.2d 603, 606 (Ill. 1988). While *Landmark Props.* stands for the proposition that a party can accept a contract by conduct, the terms still must have been offered in the first place for them to be "accepted" by conduct. Indeed, in *Landmark Props.*, the evidence showed that the party seeking to enforce the arbitration agreement had actually communicated the terms of the arbitration agreement to the resisting party, who had the agreement but did not sign it. *Landmark Props.*, 526 N.E.2d 606 ("The evidence indicates that the defendant sent a written contract to the plaintiffs because it felt that the services it had been required to perform were not clearly defined. The plaintiffs never rejected the form agreements but sent correspondence to the defendant indicating that payment would be forthcoming provided all of the services were performed in accordance with the AIA contract."). But here, the terms were never offered to Mohammed. So, while Uber may have suffered Mohammed to work on some arrangement, that arrangement is not co-extensive with the terms set forth in Def. Ex. 1.

The seminal case of *Duldalao v. St. Mary of Nazareth Hospital Center,* 505 N.E.2d 314 (Ill.1987) offers some guidance. *Duldalao* clarified that an employer's unilaterally imposed terms (e.g., in an employee handbook) could form a contract, but only if the requirements of offer, acceptance, and consideration were met. *Duldalao* specifically held that "the statement must be disseminated to the employee in such a manner that *the employee is aware of its contents* and reasonably believes it to be an offer" and that "the employee must accept the offer by commencing or continuing to work *after learning of the policy statement*." *Duldalao,* 505 N.E.2d 318 (emphasis supplied). But Uber's making its terms "available" on a driver portal without ever directly telling Mohammed to view them because they are terms of his continued employment (or service) does

9

not satisfy *Duldalao*, and does not show the terms were offered to Mohammed. An employee handbook that is kept in a filing cabinet cannot form a contract. For such terms to be "accepted" by an employee's continued labor, they must be clearly communicated to the employee. Because the terms of the agreement set forth in Def. Ex. 1 were not clearly communicated to Mohammed, his conduct of continuing to drive for Uber cannot constitute an acceptance of those terms, which he was unaware of.

### III. Because Uber reserved to itself the right to unilaterally change any contract provision – including the arbitration clause – any promise it made was illusory and not adequate consideration.

In order to retain the maximum flexibility to run its business, Uber reserved for itself the right to unilaterally change all the terms of the agreement it sought to use to govern its relationship with its drivers. In its agreement, its provided that:

> The Company reserves the right to modify or supplement the terms and conditions of this Agreement at any time, effective upon publishing a modified version of this Agreement, or upon publishing the supplemental terms to this Agreement, on the Software or via email or on you online Partner Dashboard.
>
> You hereby expressly acknowledge and agree that, by using or receiving the Service, and downloading, installing or using the Software, you and Company are bound by the then-current version of this Agreement, including any modifications and supplements to this Agreement or documents incorporated herein. Continued use of the Service or Software after any modifications or supplements to the Agreement shall constitute your consent to such modifications and supplements. You are responsible for regularly reviewing this Agreement.

Def. Ex. 1.

Circuit law is clear that such a reservation renders the contract illusory. *Druco Rests., Inc. v. Steak N Shake Enters.*, 765 F.3d 776, 782 (7th Cir. 2014)(citing cases). *Druco* collected cases standing for this proposition including the earlier Circuit precedent *Gibson v. Neighborhood Health Clinics*, 121 F.3d 1126, 1133 (7th Cir. 1997). In *Gibson,* this Court highlighted the need

for each party to actually be aware of the definite terms of the exchanged promises for those promises to be adequate consideration. *Gibson*, 121 F.3d 1131. But *Gibson* is perhaps more notable for the succinct guidance in Judge Cudahy's concurrence:

> …not only did NHC retain the right to change or revoke ay term contained in the Manual at any time and without notice, but it also declared that the Manual "does not constitute a contract nor a promise of any kind." It is quite clear that NHC has committed itself to nothing. Under these circumstances it would be quite unfair to impose arbitration unilaterally on the plaintiff. Employers seeking to prescribe arbitration for the future should be required to "turn square corners."

*Gibson* at 1133. Here, by reserving itself the right to change any contract term, including the arbitration clause, it is "quite clear" that Uber "has committed itself to nothing." Therefore, its promises were illusory and there is no consideration. Federal Courts of Appeal are uniform in their finding that a contract providing for arbitration in which one side retains the right to alter the agreement is illusory. *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002)("We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope illusory."); *see also Morrison v. Amway Corp.*, 517 F.3d 248, 257 (5th Cir. 2008)(discussing failure to provide for savings clause precluding unilateral changes from applying retroactively).

Uber – like the proverbial hog – was overly greedy in reserving itself a right to change all the terms of its "contract," including the arbitration clause. But in doing so, it rendered its contractual consideration illusory. As stated by the leading Illinois precedent of *W.E. Erickson Constr.*, 641 N.E.2d 864:

> An illusory promise appears to be a promise, but on closer examination reveals that the promisor has not promised to do anything. An illusory promise is also defined as one in which the performance is optional. Either way, *it is not sufficient consideration to support a contract*.

*Id.* (internal citations omitted, emphasis supplied); *see also Keefe v. Allied Home Mortg. Corp.*, 912 N.E.2d 310, 314 (Ill. App. 2009).

Because of its greed, Uber's purported contract fails for lack of consideration even if it was offered to and accepted by Abdul Mohammed.

### IV. Mohammed is credible

At trial, Uber launched a desperate broadside on Mohammed's credibility. The Court heard the testimony and has the experience to weigh the plaintiff's credibility on the stand. But one argument deserves at least modest treatment. Uber argues that Mohammed defrauded it and its chief domestic competitor, Lyft, by collecting a sign-up bonus from each of them. But while Uber suggests that Mohammed was required to stop driving for Lyft to collect the Uber sign-up bonus, and vice versa, it failed to bring in evidence showing: (1) the actual terms of its promotion, (2) Mohammed's knowledge and acceptance of the actual terms of the promotion, or (3) anything suggesting Mohammed was not trustworthy in collecting a sign-up bonus.

Mohammed testified credibly and consistently despite aggressive cross examination and there is no basis to discount or discredit his testimony.

### Conclusion

Uber cannot show it communicated an offer of an arbitration agreement to Mohammed. It cannot show Mohammed accepted that alleged offer. And by reserving itself the right to unilaterally change that arbitration agreement (and any of its other terms) it left the agreement without consideration, rendering it illusory. For these reasons, the Court should make the corresponding findings of fact and then find as a matter of law that Mohammed did not have an agreement with Uber to arbitrate his disputes.

Date: __July 28, 2017__ Respectfully submitted,

s/ Michael P. Persoon

Despres, Schwartz & Geoghegan, Ltd.
77 W. Washington St., Ste. 711
Chicago, Illinois 60602
(312) 372-2511
mpersoon@dsgchicago.com