# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ABDUL MOHAMMED, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 2537 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| UBER TECHNOLOGIES, INC., RASIER, LLC, TRAVIS KALANICK, and RYAN GRAVES, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Abdul Mohammed ("Mohammed") drove for Uber Technologies, Inc. ("Uber"). He has since filed a twenty-one count *pro se* complaint against Uber,[1] Uber's wholly owned subsidiary, Rasier, LLC ("Rasier"), as well as individuals Travis Kalanick, Garrett Camp, and Ryan Graves (collectively, "Defendants"),[2] raising claims under various state and federal laws and the U.S. Constitution. Defendants have moved to compel arbitration of Mohammed's claims. Having held a trial on the formation of the parties' arbitration agreement, the Court concludes that an agreement was formed. The Court therefore compels arbitration and stays this action.

---

[1] Subsequent to filing his complaint, Mohammed retained counsel to represent him in the proceedings discussed herein. At present, however, he stands on his original complaint.

[2] Defendant Camp was dismissed on February 14, 2017, for want of personal jurisdiction. *Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 735 (N.D. Ill. 2017).

**Procedural History**

Mohammed filed his complaint on February 24, 2016. *See* ECF No. 1. On May 3, 2016, Defendants moved to compel arbitration of Mohammed's claims. *See* Defs.' Mots. Compel Arbitration, ECF Nos. 14, 17. The Court denied Defendants' motions on February 14, 2017. *Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 724 (N.D. Ill. 2017).

In its opinion, the Court explained that, while the Federal Arbitration Act mandates the enforcement of valid, written arbitration agreements, a court must, before compelling arbitration, ensure that such an agreement exists. *Id.* at 725. (citing 9 U.S.C. §§ 2–4; *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002)). The Court then analyzed the parties' competing versions of what transpired when Mohammed signed up to drive for Uber. *Id.* at *730–32. It ultimately determined that Mohammed, who denied ever seeing or agreeing to the arbitration agreement at issue, had raised a triable issue as to whether he had formed an arbitration agreement with Defendants. *Id.* at 732. In so holding, the Court accepted Mohammed's testimony as true and construed all justifiable inferences in his favor. *Id.* at 725 (quoting *Tinder*, 305 F.3d at 735).

Section 4 of the Federal Arbitration Act affords a party opposing arbitration a jury trial right where the formation of an arbitration agreement is at issue. 9 U.S.C. § 4. Here, however, Mohammed waived his jury trial right. *See* Orders of 3/07/17 & 4/4/17, ECF Nos. 52, 57; Pl.'s Limited Waiver of Jury & Consent to Bench

2

Trial, ECF No. 59. Thus, after limited discovery related to the parties' formation of an arbitration agreement, the Court held a one-day bench trial on June 14, 2017.

## Standard of Decision

Where an action is "tried on the facts without a jury," Federal Rule of Civil Procedure 52 requires the district court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a); *see Khan v. Fatima,* 680 F.3d 781, 785 (7th Cir. 2012). In doing so, the district court must "explain the grounds" of its decision and provide a "reasoned, articulate adjudication." *Aprin v. United States.,* 521 F.3d 769, 776 (7th Cir. 2008).

In rendering its decision in this case, the Court has considered the admissible testimony and documentary evidence offered at trial. In so doing, the Court has considered the weight to be given to the evidence and has assessed the credibility of the witnesses in light of their demeanor, their ability to see, hear, and know the matters about which they testified, and any potential for bias. Furthermore, the Court has considered the memoranda and proposed findings of facts submitted by the parties after the trial and the legal and factual arguments set forth therein.

## The Trial

### A. Defendants' Witnesses

Defendants called two witnesses.[3] The first was Brian Moloney, a Senior Operations Manager at Uber Chicago. Bench Trial Tr. ("Tr.") at 10:14–15, ECF No.

---

[3] Defendants also offered the testimony of a third witness, James Hawkins. Hawkins is a Product Operations Specialist who investigates fraud in conjunction with Uber's products and promotions. *Id.* at 113:7–21. He testified concerning conduct by which Uber believes Mohammed created a number of fraudulent rider accounts. *See generally id.* at

3

77. Moloney began working for Uber in June 2014. *Id.* at 10:16–17. In October 2014, when Mohammed signed up to drive with Uber, Moloney served as an Operations and Logistics Manager in Uber's Chicago office. *Id.* at 10:16–19. In this capacity, Moloney was responsible for, among other things, "in-person support." *Id.* at 10:20–22. This support consisted of assisting Uber drivers with inquiries regarding the Uber application ("app") used in conjunction with driving for Uber, including instances in which drivers "ha[d] an issue signing up" to drive with Uber. *Id.* at 11:1–7. Through his role, Moloney became familiar with the process Uber used to sign up drivers through the app, *id.* at 11:15–18, which was the subject of his testimony, *see generally id.* at 10:12–48:2.

The second was Shea Munion. Munion worked for Uber Chicago from late 2012 through March 2015. *Id.* at 49:3–8. As an Operations Coordinator, Munion's primary responsibilities at Uber were "providing support to the Uber driver-partners at the partner support center, which ranged from on-boarding them to supporting them once they were actually using the system." *Id.* at 49:11–16. In this role, Munion also became familiar with the driver sign-up process. *Id.* at 49:17–24. He testified about his practices as part of that process, particularly with respect to October 1, 2014, when Uber records indicate that Munion met with Mohammed and assisted him in signing up to drive with Uber. *See generally id.* at 48:23–63:1.

---

112:22–146:21. The Court determined that this evidence was not relevant to the issue of whether Mohammed entered into an agreement with Uber to arbitrate disputes that might arise in his role as driver. *Id.* at 111:20–25. Nevertheless, the Court received the evidence on proffer. *Id.* at 111:2–4.

**B.     Mohammed's Witnesses**

Mohammed called only himself.  He began driving for Uber on October 1, 2014.  *Id.* at 64:23–25.  He gave his account of what occurred when he signed up to serve as a driver on that day, as well as a number of other items related to his time as a driver.  *See generally id.* at 64:6–102:5.

## Findings of Fact

1. Uber Technologies, Inc. provides transportation by utilizing an app to connect riders with independent drivers.  *See* Defs.' Ex. 1.  At all times relevant to this dispute, Uber partnered with Rasier, LLC, which licensed the Uber app and provided a platform for drivers to connect with riders.  *Id.*

2. In October 2014, drivers' engagement with Uber was governed in part by the "Rasier Software Sublicense & Online Services Agreement," or the "Rasier Agreement."  *See id.*; Tr. at 16:19–17:19.

3. The Rasier Agreement contains an arbitration provision.  Defs.' Ex. 1, at 11–15; Tr. at 17:8–19.  The provision is governed by the Federal Arbitration Act and mandates arbitration broadly, "without limitation, to disputes arising out of or related to [the] Agreement and disputes arising out of related to [a driver's] relationship with" Rasier or Uber.  Defs.' Ex. 1, at 12–13.  If a driver does not wish to be subject to the arbitration provision, the Rasier Agreement details how the driver may opt out.  *Id.* at 15.

4. The first page of the Rasier Agreement states, in bold, capital font beginning with "**IMPORTANT**," that the Rasier Agreement contains an arbitration

5

provision that mandates arbitration for disputes with the company. *Id.* at 1. The same paragraph explains that accepting the Rasier Agreement constitutes consent to the arbitration provision, and notes that it is possible to opt out of the arbitration provision by following instructions found later in the document. *Id.*

5. In October 2014, individuals seeking to drive for Uber first completed a number of preliminary steps, including creating an account and undergoing a background check. Tr. at 11:22–12:16. After completing these preliminary steps, Uber employees were responsible for ensuring compliance and "activating" drivers' accounts. *Id.* at 12:24–13:3. Without activation, a driver could not use the app and drive for Uber. *Id.* at 13:6–13:10.

6. Following activation, two steps remained before a driver could begin using the app. First, the app required assent to terms and conditions of service. *Id.* at 13:15–17. Then, the app requested bank account information in order to arrange for direct deposit. *Id.* at 13:23–14:1.

7. With respect to the first step—assent to terms and conditions—the app provided two screens by which it twice requested assent. First, the app populated a screen that stated, "TO GO ONLINE, YOU MUST REVIEW ALL THE DOCUMENTS BELOW AND AGREE TO THE CONTRACTS BELOW." Defs.' Ex. 2; Tr. at 14:12–16. Three contracts were listed on the screen, including the Rasier Agreement, which could be accessed by hyperlink. Defs.' Ex. 2; Tr. at 16:5–13. Below the contracts, this first screen explained, "[b]y clicking below, you represent that you have reviewed all the documents above and that you agree to all the

6

contracts above." Defs.' Ex. 2. Below this explanation was a green button containing "Yes, I agree." *Id.*

8. If the user selected the green button containing "Yes, I agree," another screen appeared. Tr. at 15:11–12; *see* Defs.' Ex. 3. The screen stated, in bold font, "**Please confirm that you have reviewed all the documents and agree to all the new contracts.**" Defs.' Ex. 3.

9. The user was then given the option of selecting "No" or "Yes, I agree" for a second time. *Id.* Thus, in order to proceed with using the Uber app, the user was required to indicate his or her agreement to the contracts as issue—including the Rasier Agreement—two separate times. *See id.*; Tr. at 15:11–13.

10. In October 2014, when Mohammed signed up to drive for Uber, Uber had a partner support center in Chicago. *Id.* at 11:3–4. Moloney and Munion each provided partner support out of the Chicago center. *See id.* at 11:3–18, 35:9–19; 49:3–16.

11. Munion assisted Mohammed with the process of signing up to drive for Uber on October 1, 2014. *Id.* at 21:7–19; 22:9–17; 23:13–18, 51:1–13; *see* Defs.' Exs. 7–8.

12. Uber's records reflect that the "Yes I agree" buttons were selected in connection with Mohammed's account, indicating assent to the Rasier Agreement, on October 1, 2014. *Id.* at 19:18–21:2; Defs.' Ex. 9.

13. Munion does not remember assisting Mohammed. *Id.* at 51:12–15. As an Operations Coordinator, he assisted "many, many" drivers. *Id.* at 15:15.

7

14. In the course of assisting prospective drivers with the sign-up process, Munion adopted a "general practice" of ensuring that only the prospective driver—and not Munion—clicked to indicate acceptance of Uber's terms and conditions of service, including the Rasier Agreement. *Id.* at 53:20–54:24. Specifically, Munion required the prospective driver to hold the device or phone on which the prospective driver viewed the screens described above, informed the driver that they were agreeing to terms and conditions with Uber, gave the driver time to read the Rasier Agreement if the driver wished, and left the driver—and only the driver—to select "Yes, I agree." *Id.*

In finding that Munion adopted such a practice, the Court deems his testimony to this effect credible in light of several considerations.[4] First, Munion

---

[4] In his post-hearing brief, Mohammed challenges the existence of such a practice on the basis that Defendants adduced no evidence of formal training or a written document establishing this practice. Pl.'s Post-Trial Br. at 5, 8, ECF No. 78. Insofar as Mohammed challenges the admissibility of Munion's testimony for this purpose, however, his argument is too late, because he did not object at trial. *See Walker v. Groot*, No. 14-2478, 2017 WL 3474048, at *4 (7th Cir. Aug. 14, 2017).

In any event, his challenge falls flat. First, whether Munion received formal training or not, the Court finds that he adopted a personal practice of requiring prospective drivers to assent to the Rasier Agreement. Munion assisted so many prospective drivers (as many as thirty per day) so frequently in his role as an Operations Coordinator such that he repeatedly and systematically ensured that they clicked acceptance to the Rasier Agreement. Tr. at 51:14–15, 53:20–54:24, 55:14–24, 56:2–17; *see Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293–94 (7th Cir. 1988). In addition, Federal Rule of Evidence 406 explains that there need not be any documentation of his practice in order for it to be admissible: "Evidence of a person's habit . . . may be admitted to prove that on a particular occasion the person . . . acted in accordance with the habit . . . . The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness." Fed. R. Evid. 406; *see Rosenburg v. Lincoln Am. Life Ins. Co.*, 883 F.2d 1328, 1336 (7th Cir. 1989) (holding that witnesses' testimony was sufficient to establish the existence of a practice).

offered a sincere reason for adopting such a practice. He explained that he understood that the Rasier Agreement was between a prospective driver and Uber, and was therefore "personal[ ]" and "important . . . to the person who's signing up." Tr. at 54:10–15. Second, Munion, who no longer works for Uber, *see id.* at 49:1–6, has no stake in the controversy, and thus no reason to testify untruthfully. Third, Moloney also testified that he was instructed to adopt a similar practice. *Id.* at 44:9–45:21.[5] The fact that another Uber employee believed that the company had adopted such a practice lends credence to Munion's testimony that he had adopted such a practice. Finally, Munion's demeanor and temperament as a witness reflected an intent to testify genuinely, honestly, and reliably.

15. Consistent with this practice, on October 1, 2014, Munion ensured that Mohammed selected "Yes, I agree" on each screen, reflecting his assent to the Rasier Agreement.

In finding that it was Mohammed (rather than Munion) who selected "Yes, I agree" on each screen, the Court does not find Mohammed's testimony otherwise, *see* Tr. at 66:8–67:19, to be credible for several reasons. First, Mohammed testified as to two aspects of his interaction with Munion that, according to both Munion and Moloney, are inconsistent with Uber's driver sign-up process as of October 1, 2014.

---

[5] Mohammed objects to this fact in his post-trial brief on the basis that it is founded on inadmissible hearsay. Pl.'s Post-Trial Br. at 5–6, 8; *see generally* Tr. at 46:19–47:23. Once again, this objection is offered too late. *Walker*, 2017 WL 3474048, at *4. But, in any event, the out-of-court statements on which Moloney relied are not taken here for their truth. Rather, they are admissible to demonstrate their effect on Moloney, who testified that he adhered to the practice during his employment at Uber, as did the other Uber employees he observed. Tr. at 45:3–21.

9

According to Mohammed, he gave Munion a $100 cash deposit for a leased phone. *Id.* at 66:10–12. But in October 2014, Uber did not accept cash toward the then-$200 deposit on leased phones. *See id.* at 18:2–19:4; 51:20–52:22. In addition, Mohammed claimed that Munion logged him into a leased phone. *Id.* at 66:13–19. But Uber, which keeps records of every log-in to a leased phone, has no record of Munion logging Mohammed into a leased phone. *Id.* at 19:5–17. Mohammed makes no effort to explain these inconsistencies. They suggest that Mohammed's memory as to his interaction with Munion is unreliable or otherwise incorrect.

Second, unlike Munion, Mohammed has a direct stake in the controversy, which provides greater reason to doubt the credibility of his testimony. And, third, several of Mohammed's responses on cross-examination raised questions as to his credibility. For example, his Facebook page lists that he graduated from Stanford University, which he never attended. *Id.* at 67:25–69:19.[6] In addition, as part of an effort to obtain certain signing bonuses from both Uber and Lyft, Mohammed both (1) misrepresented to at least one of the companies that he was not yet an active driver for the company, *id.* at 83:22–87:22, and (2) falsely stated to Lyft that he was no longer driving with Uber, when he still was, *id.* at 85:2–86:2.[7] In addition, Mohammed testified that he could not remember or did not know if he had created

---

[6] Mohammed initially suggested that he did not know why Stanford was listed, then said that he may have mistakenly selected it, and finally maintained that the account is not active. *Id.*

[7] These statements must have been false irrespective of the fact that the terms of the promotion were not admitted into evidence, as Mohammed points out. *See* Pl.'s Post-Trial Br. at 12.

10

certain fraudulent Uber rider accounts and driven the accounts in a circle near his home in order to manipulate an Uber promotion. Tr. at 88:3–98:6. The Court finds that these responses further undermine Mohammed's credibility and increase the likelihood that his testimony about his interaction with Munion is not accurate.

16. Mohammed thereafter used Uber's app and connection to riders to provide over 2000 rides. *Id.* at 90:17–18.

## Analysis

The Federal Arbitration Act permits a court to compel arbitration where there is "a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005); *see* 9 U.S.C. §§ 3–4. Here, only the existence of an agreement to arbitrate is at issue. And, as the parties seeking to compel arbitration, Defendants bear the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence. *See Cwik v. First Stop Health, LLC*, No. 12 C 6238, 2016 WL 1407708, at *4–5 (N.D. Ill. Apr. 10, 2016); *see also Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017).

The question of whether Mohammed formed an agreement to arbitrate with Uber is governed by state law. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010). In this case, the parties agree that Illinois law applies. Defs.' Stmts. of Fact & Conclusions of Law ¶ 72, ECF No. 76; Pl.'s Post-Trial Br. at 6–7.

"In Illinois, an offer, an acceptance and consideration are the basic ingredients of a contract." *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109 (Ill.

2006). An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 561 (7th Cir. 2012) (internal quotation marks and citations omitted) (applying Illinois law). To accept an offer, a party must objectively manifest intent to be bound to the contract's terms. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016) (applying Illinois law). And consideration is "'a bargained-for exchange, whereby the promisor . . . receives some benefit, or the promisee . . . suffers detriment.'" *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 866 (7th Cir. 2013) (alteration in original) (quoting *Vassilkovska v. Woodfield Nissan, Inc.*, 830 N.E.2d 619, 624 (Ill. App. Ct. 2005)).

Here, the Court finds that Defendants have established, by a preponderance of the evidence, that Uber offered the Rasier Agreement (and the arbitration provision contained therein) to Mohammed when it presented him with the agreement as part of the driver sign-up process. Tr. at 14:12–16, 15:11–13, 16:5–13; Defs.' Exs. 2–3.[8] Defendants have also proven that it is more likely than not that Mohammed accepted the agreement by clicking "Yes, I agree" to two different screens after being presented with a hyperlink to the agreement. *See id.* at 19:18–

---

[8] To the extent Mohammed argues that Uber's conduct did not constitute an offer because Munion did not explain the terms of the arbitration provision to him, Pl.'s Post-Trial Br. at 8, this argument is unavailing. *See Sgouros*, 817 F.3d at 1034 ("Generally, a party who signs a written contract is presumed to have notice of all of the contract's terms."); *accord Janiga*, 615 F.3d at 743. Moreover, the Court concurs with the conclusions of various other courts that Uber's sign-up process provided reasonable notice of the arbitration provision contained in the Rasier Agreement. *See* Defs.' Post-Trial Reply at 3–4, ECF No. 80 (collecting cases).

12

21:2, 21:7–19; 22:9–17; 23:13–18, 51:1–13, 53:20–54:21; Defs.' Exs. 7–9. Finally, Defendants have shown, by a preponderance of the evidence, that Uber provided consideration for the agreement through providing Mohammed with the benefits of its app and connection to riders in conjunction with over 2000 rides. *Id.* at 90:17–18.

In a last-ditch effort to avoid arbitration, Mohammed spends most of his post-trial brief arguing (for the first time) that the Rasier Agreement is indefinite or otherwise unenforceable because it contains an illusory promise. Pl.'s Post-Trial Br. at 7–8, 10–12. Mohammed grounds this argument in a provision of the Rasier Agreement titled "Modifications," which states:

> The Company reserves the right to modify or supplement the terms and conditions of this Agreement at any time, effective upon publishing a modified version of this Agreement, or upon publishing the supplemental terms to this Agreement, on the Software or via email or on your online Partner Dashboard.
>
> You hereby expressly acknowledge and agree that, by using or receiving the Service, and downloading, installing or using the Software, you and Company are bound by the then-current version of this Agreement, including any modifications and supplements to this Agreement or documents incorporated herein. Continued use of the Service or Software after any modifications or supplements to the Agreement shall constitute your consent to such modifications and supplements. You are responsible for regularly reviewing this Agreement.

*See* Defs.' Ex. 1, at 16. Mohammed contends, in pertinent part, that "Uber—like the proverbial hog—was overly greedy in reserving itself a right to change all terms of its 'contract,' including the arbitration clause," and thereby "rendered its contractual consideration illusory." Pl.'s Post-Trial Br. at 11.

13

This argument fails in two germane respects. First, it is impermissibly tardy. Mohammed could have raised this argument long before the Court and the parties went to the time and expense of conducting discovery and a trial on the parties' formation of an agreement to arbitrate. Mohammed should have sought leave to make such an argument at an earlier time. As such, he waived his opportunity to bring it now.

Even on the merits, however, Mohammed is mistaken. "'An illusory promise appears to be a promise, but on closer examination reveals that the promisor has not promised to do anything . . . . An illusory promise is also defined as one in which the performance is optional.'" *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1206–07 (7th Cir. 1998) (alteration in original) (quoting *W.E. Erickson Const., Inc. v. Chi. Title Ins. Co.*, 641 N.E.2d 861, 864 (Ill. App. Ct. 1994)). Plainly, the modification provision in the Rasier Agreement does not indicate that Uber promises nothing, or that its performance is optional. Rather, the provision indicates only that Uber can modify the contract at a later date, to which the driver must assent. The initial agreement, in comparison, was enforceable against Uber upon its entry.

The authorities on which Mohammed relies do not indicate otherwise. *Druco Restaurants, Inc. v. Steak N Shake Enterprises, Inc.*, 765 F.3d 776 (7th Cir. 2014), involved a contract that permitted the defendant to unilaterally impose arbitration without assent from the plaintiff, *id.* at 780, 782–83, unlike the Rasier Agreement, which binds both parties to arbitration (unless Mohammed had opted out, *see* Defs.'

Ex. 1, at 15) and requires both parties' assent to any modifications. Moreover, the very language Mohammed quotes from *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126 (7th Cir. 1997)—where the agreement at issue expressly disclaimed creation of a contract, and it was "'quite clear that [the defendant] ha[d] committed itself to nothing,'" Pl.'s Post-Trial Br. at 11 (quoting *Gibson*, 121 F.3d at 1133 (Cudahy, J., concurring))—indicates why it is inapposite. The decisions from other circuits on which Mohammed relies, *id.* at 7, 11, are distinguishable for the same reasons. Accordingly, the Court finds that Uber's promise underlying the Rasier Agreement was not illusory.

## Conclusion of Law

Based on the evidence submitted at trial, Defendants have sustained their burden of proving by a preponderance of the evidence that Mohammed entered into a written agreement to arbitrate his dispute with Uber when he signed up to drive on October 1, 2014.[9]

## Conclusion

Mohammed formed a written agreement to arbitrate his dispute against Defendants on October 1, 2014. Pursuant to 9 U.S.C. § 3, the Court stays the case pending arbitration. *See Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 561 (7th Cir. 2008). This case is placed on the Court's suspended trial

---

[9] Because the Court finds that the parties entered into an agreement to arbitrate on this date, it need not consider Defendants' additional argument that Mohammed assented to the Rasier Agreement by his conduct after October 1, 2014.

15

calendar. The parties are instructed to inform the Court within thirty days of the conclusion of the arbitration proceeding.

**IT IS SO ORDERED.**              **ENTERED   3/7/18**

_____
**John Z. Lee**
**United States District Judge**